# MITCHUM, DBA BOOK MART *v.* FOSTER ET AL.

No. 70–27.   Argued December 13, 1971—Decided June 19, 1972

STEWART, J., delivered the opinion of the Court, in which all members joined except POWELL and REHNQUIST, JJ., who took no part in the consideration or decision of the case. BURGER, C. J., filed a concurring opinion, in which WHITE and BLACKMUN, JJ., joined, *post,* p. 243.

*Robert Eugene Smith* argued the cause for appellant. With him on the brief was *Paul Shimek, Jr.*

*Raymond L. Marky,* Assistant Attorney General of Florida, argued the cause for appellees. With him on the brief were *Robert L. Shevin,* Attorney General, and *George R. Georgieff,* Assistant Attorney General.

*George F. Kugler, Jr.,* Attorney General of New Jersey, and *Michael R. Perle* and *John DeCicco,* Deputy Attorneys General, filed a brief for the State of New Jersey as *amicus curiae.*

226

MR. JUSTICE STEWART delivered the opinion of the Court.

The federal anti-injunction statute provides that a federal court "may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."[1] An Act of Congress, 42 U. S. C. § 1983, expressly authorizes a "suit in equity" to redress "the deprivation," under color of state law, "of any rights, privileges, or immunities secured by the Constitution . . . ."[2] The question before us is whether this "Act of Congress" comes within the "expressly authorized" exception of the anti-injunction statute so as to permit a federal court in a § 1983 suit to grant an injunction to stay a proceeding pending in a state court. This question, which has divided the federal courts,[3] has lurked in the background of many of our recent cases, but we have not until today explicitly decided it.[4]

---

[1] 28 U. S. C. § 2283.

[2] The statute provides in full: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[3] Compare Cooper v. Hutchinson, 184 F. 2d 119 (CA3) (§ 1983 is an "expressly authorized" exception), with Baines v. City of Danville, 337 F. 2d 579 (CA4) (§ 1983 is not an "expressly authorized" exception).

[4] See Dombrowski v. Pfister, 380 U. S. 479, 484 n. 2; Cameron v. Johnson, 390 U. S. 611, 613 n, 3; Younger v. Harris, 401 U. S. 37, 54. See also Lynch v. Household Finance Corp., 405 U. S. 538, 556; Roudebush v. Hartke, 405 U. S. 15.

In Younger, supra, MR. JUSTICE DOUGLAS was the only member of the Court who took a position on the question now before us. He expressed the view that § 1983 is included in the "expressly author-

## I

The prosecuting attorney of Bay County, Florida, brought a proceeding in a Florida court to close down the appellant's' bookstore as a public nuisance under the claimed authority of Florida law. The state court entered a preliminary order prohibiting continued operation of the bookstore. After further inconclusive proceedings in the state courts, the appellant filed a complaint in the United States District Court for the Northern District of Florida, alleging that the actions of the state judicial and law enforcement officials were depriving him of rights protected by the First and Fourteenth Amendments. Relying upon 42 U. S. C. § 1983,[5] he asked for injunctive and declaratory relief against the state court proceedings, on the ground that Florida laws were being unconstitutionally applied by the state court so as to cause him great and irreparable harm. A single federal district judge issued temporary restraining orders, and a three-judge court was convened pursuant to 28 U. S. C. §§ 2281 and 2284. After a hearing, the three-judge court dissolved the temporary restraining orders and refused to enjoin the state court proceeding, holding that the "injunctive relief sought here

ized exception to § 2283 . . . ." 401 U. S., at 62. Cf. *id.*, at 54 (STEWART, J., joined by Harlan, J., concurring); *Perez* v. *Ledesma,* 401 U. S. 82, 120 n. 14 (separate opinion of BRENNAN, J., joined by WHITE and MARSHALL, JJ.).

[5] Federal jurisdiction was based upon 28 U. S. C. § 1343 (3). The statute states in relevant part:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . . ."

as to the proceedings pending in the Florida courts does not come under any of the exceptions set forth in Section 2283. It is not expressly authorized by Act of Congress, it is not necessary in the aid of this court's jurisdiction, and it is not sought in order to protect or effectuate any judgment of this court." 315 F. Supp. 1387, 1389. An appeal was brought directly here under 28 U. S. C. § 1253,[6] and we noted probable jurisdiction. 402 U. S. 941.

## II

In denying injunctive relief, the District Court relied on this Court's decision in *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*, 398 U. S. 281. The *Atlantic Coast Line* case did not deal with the "expressly authorized" exception of the anti-injunction statute,[7] but the Court's opinion in that case does bring into sharp focus the critical importance of the question now before us. For in that case we expressly rejected the view that the anti-injunction statute merely states a flexible doctrine of comity,[8] and made clear that the statute imposes an absolute ban upon the issuance of a federal injunction against a pending

---

[6] The statute provides: "Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges."

[7] At issue were the other two exceptions of the anti-injunction statute: "where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." *Atlantic Coast Line R. Co.* v. *Brotherhood of Locomotive Engineers*, 398 U. S. 281, 288.

[8] See *First National Bank & Trust Co.* v. *Village of Skokie*, 173 F. 2d 1; *Baines*, 337 F. 2d, at 593. See also Taylor & Willis, The Power of Federal Courts to Enjoin Proceedings in State Courts, 42 Yale L. J. 1169, 1194 (1933).

state court proceeding, in the absence of one of the recognized exceptions:

> "On its face the present Act is an absolute. prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions. The respondents here have intimated that the Act only establishes a 'principle of comity,' not a binding rule on the power of the federal courts. The argument implies that in certain circumstances a federal. court may enjoin state court proceedings even if that action cannot be justified by any of the three exceptions. We cannot accept any such contention. . . . [We] hold that any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be. upheld. . . ." 398 U. S., at 286–287.

It follows, in the present context, that if 42 U. S. C. § 1983 is not within the "expressly authorized" exception of the anti-injunction statute, then a federal equity court is wholly without power to grant any relief in a § 1983 suit seeking to stay a state court proceeding. In short, if a § 1983 action is not an "expressly authorized" statutory exception, the anti-injunction law absolutely prohibits in such an action all federal equitable intervention in a pending state court proceeding, whether civil or criminal, and regardless of how extraordinary the particular circumstances may be.

Last Term, in *Younger* v. *Harris,* 401 U. S. 37, and its companion cases,[9] the Court dealt at length with the subject of federal judicial intervention in pending

---

[9] *Samuels* v. *Mackell,* 401 U. S. 66; *Boyle* v. *Landry,* 401 U. S. 77; *Perez* v. *Ledesma,* 401 U. S. 82; *Dyson* v. *Stein,* 401 U. S. 200; *Byrne* v. *Karalexis,* 401 U. S. 216.

state criminal prosecutions. In *Younger* a three-judge federal district court in a § 1983 action had enjoined a criminal prosecution pending in a California court. In asking us to reverse that judgment, the appellant argued that the injunction was in violation of the federal anti-injunction statute. 401 U. S., at 40. But the Court carefully eschewed any reliance on the statute in reversing the judgment, basing its decision instead upon what the Court called "Our Federalism"—upon "the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." 401 U. S., at 41, 44.

In *Younger,* this Court emphatically reaffirmed "the fundamental policy against federal interference with state criminal prosecutions." 401 U. S., at 46. It made clear that even "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it." 401 U. S., at 54. At the same time, however, the Court clearly left room for federal injunctive intervention in a pending state court prosecution in certain exceptional circumstances—where irreparable injury is "both great and immediate," 401 U. S., at 46, where the state law is " 'flagrantly and patently violative of express constitutional prohibitions,' " 401 U. S., at 53, or where there is a showing of "bad faith, harassment, or . . . other unusual circumstances that would call for equitable relief." 401 U. S., at 54. In the companion case of *Perez* v. *Ledesma,* 401 U. S. 82, the Court said that "[o]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending

state prosecutions appropriate." 401 U. S., at 85. See also *Dyson* v. *Stein,* 401 U. S. 200, 203.

While the Court in *Younger* and its companion cases expressly disavowed deciding the question now before us—whether § 1983 comes within the "expressly authorized" exception of the anti-injunction statute, 401 U. S., at 54—it is evident that our decisions in those cases cannot be disregarded in deciding this question. In the first place, if § 1983 is not within the statutory exception, then the anti-injunction statute would have absolutely barred the injunction issued in *Younger,* as the appellant in that case argued, and there would have been no occasion whatever for the Court to decide that case upon the "policy" ground of "Our Federalism." Secondly, if § 1983 is not within the "expressly authorized" exception of the anti-injunction statute, then we must overrule *Younger* and its companion cases insofar as they recognized the permissibility of injunctive relief against pending criminal prosecutions in certain limited and exceptional circumstances. For, under the doctrine of *Atlantic Coast Line,* the anti-injunction statute would, in a § 1983 case, then be an "absolute prohibition" against federal equity intervention in a pending state criminal *or* civil proceeding—under any circumstances whatever.

The *Atlantic Coast Line* and *Younger* cases thus serve to delineate both the importance and the finality of the question now before us. And it is in the shadow of those cases that the question must be decided.

### III

The anti-injunction statute goes back almost to the beginnings of our history as a Nation. In 1793, Congress enacted a law providing that no "writ of injunction be granted [by any federal court] to stay proceedings

in any court of a state. . . ." Act of March 2, 1793; 1 Stat. 335. The precise origins of the legislation are shrouded in obscurity,[10] but the consistent understand-

[10] "The history of this provision in the Judiciary Act of 1793 is not fully known. We know that on December 31, 1790, Attorney General Edmund Randolph reported to the House of Representatives on desirable changes in the Judiciary Act of 1789. Am. State Papers, Misc., vol. 1, No. 17, pp. 21–36. The most serious question raised by Randolph concerned the arduousness of the circuit duties imposed on the Supreme Court justices. But the Report also suggested a number of amendments dealing with procedural matters. A section of the proposed bill submitted by him provided that 'no injunction in equity shall be granted by a district court to a judgment at law of a State court.' *Id.*, p. 26. Randolph explained that this clause 'will debar the district court from interfering with the judgments at law in the State courts; for if the plaintiff and defendant rely upon the State courts, as far as the judgment, they ought to continue there as they have begun. It is enough to split the same suit into one at law, and another in equity, without adding a further separation, by throwing the common law side of the question into the State courts, and the equity side into the federal courts.' *Id.*, p. 34. The Report was considered by the House sitting as a Committee of the Whole, and then was referred to successive special committees for further consideration. No action was taken until after Chief Justice Jay and his associates wrote the President that their circuit-riding duties were too burdensome. American State Papers, Misc., vol. 1, No. 32, p. 51. In response to this complaint, which was transmitted to Congress, the Act of March 2, 1793, was passed, containing in § 5, *inter alia*, the prohibition against staying state court proceedings.

"Charles Warren in his article *Federal and State Court Interference*, 43 Harv. L. Rev. 345, 347, suggests that this provision was the direct consequence of Randolph's report. This seems doubtful, in view of the very narrow purpose of Randolph's proposal, namely, that federal courts of equity should not interfere with the enforcement of judgments at law rendered in the state courts. See Taylor and Willis, *The Power of Federal Courts to Enjoin Proceedings in State Courts*, 42 Yale L. J. 1169, 1171, n. 14.

"There is no record of any debates over the statute. See 3 Annals of Congress (1791–93). It has been suggested that the provision reflected the then strong feeling against the unwarranted intrusion

ing has been that its basic purpose is to prevent "need-less friction between state and federal courts." *Oklahoma Packing Co.* v. *Gas Co.*, 309 U. S. 4, 9. The law remained unchanged until 1874, when it was amended to permit a federal court to stay state court proceedings that interfered with the administration of a federal bankruptcy proceeding.[11] The present wording of the legislation was adopted with the enactment of Title 28 of the United States Code in 1948.

Despite the seemingly uncompromising language of the anti-injunction statute prior to 1948, the Court soon

─────────

of federal courts upon state sovereignty. *Chisholm* v. *Georgia*, 2 Dall. 419, was decided on February 18, 1793, less than two weeks before the provision was enacted into law. The significance of this proximity is doubtful. Compare Warren, *Federal and State Court Interference*, 43 Harv. L. Rev. 345, 347–348, with *Gunter* v. *Atlantic Coast Line R. Co.*, 200 U. S. 273, 291–292. Much more probable is the suggestion that the provision reflected the prevailing prejudices against equity jurisdiction. The *Journal of William Maclay* (1927 ed.), chronicling the proceedings of the Senate while he was one of its members (1789–1791), contains abundant evidence of a widespread hostility to chancery practice. See especially, pp. 92–94, 101–06 (debate on the bill that became Judiciary Act of 1789). Moreover, Senator Ellsworth (soon to become Chief Justice of the United States), the principal draftsman of both the 1789 and 1793 Judiciary Acts, often indicated a dislike for equity jurisdiction. See Brown, *Life of Oliver Ellsworth* (1905 ed.) 194; *Journal of William Maclay* (1927 ed.) 103–04; Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L. Rev. 49, 96–100." *Toucey* v. *New York Life Ins. Co.*, 314 U. S. 118, 130–132.

See also Note, 38 U. Chi. L. Rev. 612 (1971); 1A J. Moore, Federal Practice 2302 (1965); H. Hart & H. Wechsler, The Federal Courts and the Federal System 1075–1078 (1953); Durfee & Sloss, Federal Injunction Against Proceedings in State Courts: The Life History of a Statute, 30 Mich. L. Rev. 1145 (1932).

[11] As so amended, the statute provided that state court proceedings could be enjoined "where such injunction may be authorized by any law relating to proceedings in bankruptcy." Rev. Stat. § 720 (1874).

recognized that exceptions must be made to its blanket prohibition if the import and purpose of other Acts of Congress were to be given their intended scope. So it was that, in addition to the bankruptcy law exception that Congress explicitly recognized in 1874, the Court through the years found that federal courts were empowered to enjoin state court proceedings, despite the anti-injunction statute, in carrying out the will of Congress under at least six other federal laws. These covered a broad spectrum of congressional action: (1) legislation providing for removal of litigation from state to federal courts,[12] (2) legislation limiting the liability of shipowners,[13] (3) legislation providing for federal interpleader actions,[14] (4) legislation conferring federal jurisdiction over farm mortgages,[15] (5) legisla-

---

[12] See *French* v. *Hay,* 22 Wall. 250; *Kline* v. *Burke Construction Co.,* 260 U. S. 226. The federal removal provisions, both civil and criminal, 28 U. S. C. §§ 1441–1450, provide that once a copy of the removal petition is filed with the clerk of the state court, the "State court shall proceed no further unless and until the case is remanded." 28 U. S. C. § 1446 (e).

[13] See *Providence & N. Y. S. S. Co.* v. *Hill Mfg. Co.,* 109 U. S. 578. The Act of 1851, 9 Stat. 635, as amended, provides that once a shipowner has deposited with the court an amount equal to the value of his interest in the ship, "all claims and proceedings against the owner with respect to the matter in question shall cease." 46 U. S. C. § 185.

[14] See *Treinies* v. *Sunshine Mining Co.,* 308 U. S. 66. The Interpleader Act of 1926, 44 Stat. 416, as currently written provides that in "any civil action of interpleader . . . a district court may . . . enter its order restraining [all claimants] . . . from instituting or prosecuting any proceeding in any State or United States court affecting the property, instrument or obligation involved in the interpleader action." 28 U. S. C. § 2361.

[15] See *Kalb* v. *Feuerstein,* 308 U. S. 433. The Frazier-Lemke Farm-Mortgage Act, as amended in 1935, 49 Stat. 944, provides that in situations to which it is applicable a federal court shall "stay all

tion governing federal habeas corpus proceedings,[16] and (6) legislation providing for control of prices.[17]

In addition to the exceptions to the anti-injunction statute found to be embodied in these various Acts of Congress, the Court recognized other "implied" exceptions to the blanket prohibition of the anti-injunction statute. One was an *"in rem"* exception, allowing a federal court to enjoin a state court proceeding in order to protect its jurisdiction of a *res* over which it had first acquired jurisdiction.[18] Another was a "relitigation" exception, permitting a federal court to enjoin relitigation in a state court of issues already decided in federal litigation.[19] Still a third exception, more recently developed, permits a federal injunction of state

judicial or official proceedings in any court." 11 U. S. C. § 203 (s) (2) (1940 ed.).

[16] See *Ex parte Royall*, 117 U. S. 241, 248–249. The Federal Habeas Corpus Act provides that a federal court before which a habeas corpus proceeding is pending may "stay any proceeding against the person detained in any State Court . . . for any matter involved in the habeas corpus proceeding." 28 U. S. C. § 2251.

[17] Section 205 (a) of the Emergency Price Control Act of 1942, 56 Stat. 33, provided that the Price Administrator could request a federal district court to enjoin acts that violated or threatened to violate the Act. In *Porter* v. *Dicken*, 328 U. S. 252, we held that this authority was broad enough to justify an injunction to restrain state court proceedings. *Id.*, at 255. The Emergency Price Control Act was thus considered a congressionally authorized exception to the anti-injunction statute. *Ibid.*; see also *Bowles* v. *Willingham*, 321 U. S. 503. Section 205 (a) expired in 1947. Act of July 25, 1946, 60 Stat. 664.

[18] See, *e. g., Toucey* v. *New York Life Ins. Co.*, 314 U. S., at 135–136; *Freeman* v. *Howe*, 24 How. 450; *Kline* v. *Burke Construction Co.*, 260 U. S. 226.

[19] See, *e. g., Toucey, supra*, at 137–141; *Dial* v. *Reynolds*, 96 U. S. 340; *Supreme Tribe of Ben-Hur* v. *Cauble*, 255 U. S. 356. See generally 1A J. Moore, Federal Practice 2302–2311 (1965).

court proceedings when the plaintiff in the federal court is the United States itself, or a federal agency asserting "superior federal interests." [20]

In *Toucey* v. *New York Life Ins. Co.*, 314 U. S. 118, the Court in 1941 issued an opinion casting considerable doubt upon the approach to the anti-injunction statute reflected in its previous decisions. The Court's opinion expressly disavowed the "relitigation" exception to the statute, and emphasized generally the importance of recognizing the statute's basic directive "of 'hands off' by the federal courts in the use of the injunction to stay litigation in a state court." 314 U. S., at 132. The congressional response to *Toucey* was the enactment in 1948 of the anti-injunction statute in its present form in 28 U. S. C. § 2283, which, as the Reviser's Note makes evident, served not only to overrule the specific holding of *Toucey*,[21] but to restore "the basic law as generally understood and interpreted prior to the Toucey decision." [22]

We proceed, then, upon the understanding that in determining whether § 1983 comes within the "expressly authorized" exception of the anti-injunction statute, the

---

[20] *Leiter Minerals Inc.* v. *United States*, 352 U. S. 220; *NLRB* v. *Nash-Finch Co.*, 404 U. S. 138.

[21] The Reviser's Note states in part: "The exceptions specifically include the words 'to protect or effectuate its judgments,' for lack of which the Supreme Court held that the Federal courts are without power to enjoin relitigation of cases and controversies fully adjudicated by such courts. (See Toucey v. New York Life Insurance Co., . . . 314 U. S. 118 . . . .) A vigorous dissenting opinion [314 U. S. 141] notes that at the time of the 1911 revision of the Judicial Code, the power of the courts . . . of the United States to protect their judgments was unquestioned and that the revisers of that code noted no change and Congress intended no change." H. R. Rep. No. 308, 80th Cong., 1st Sess., A181–182 (1947).

[22] *Ibid.*

criteria to be applied are those reflected in the Court's decisions prior to *Toucey*.[23] A review of those decisions makes reasonably clear what the relevant criteria are. In the first place, it is evident that, in order to qualify under the "expressly authorized" exception of the anti-injunction statute, a federal law need not contain an express reference to that statute. As the Court has said, "no prescribed formula is required; an authorization need not expressly refer to § 2283." *Amalgamated Clothing Workers* v. *Richman Bros. Co.*, 348 U. S. 511, 516. Indeed, none of the previously recognized statutory exceptions contains any such reference.[24] Secondly, a federal law need not expressly authorize an injunction of a state court proceeding in order to qualify as an exception. Three of the six previously recognized statutory exceptions contain no such authorization.[25] Thirdly, it is clear that, in order to qualify as an "expressly authorized" exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding. This is not

---

[23] Cf. *Amalgamated Clothing Workers* v. *Richman Bros. Co.*, 348 U. S. 511, 521 (dissenting opinion).

[24] See nn. 12, 13, 14, 15, 16, and 17, *supra*.

[25] See nn. 12, 13, and 17, *supra*. The federal courts have found that other Acts of Congress that do not refer to § 2283 or to injunctions against state court proceedings nonetheless come within the "expressly authorized" language of the anti-injunction statute. See, *e. g.*, *Walling* v. *Black Diamond Coal Mining Co.*, 59 F. Supp. 348, 351 (WD Ky.) (the Fair Labor Standards Act); *Okin* v. *SEC*, 161 F. 2d 978, 980 (CA2) (the Public Utility Holding Company Act); *Dilworth* v. *Riner*, 343 F. 2d 226, 230 (CA5) (the 1964 Civil Rights Act); *Studebaker Corp.* v. *Gittlin*, 360 F. 2d 692 (CA2) (the Securities and Exchange Act).

to say that in order to come within the exception an
Act of Congress must, on its face and in every one of
its provisions, be totally incompatible with the prohibi-
tion of the anti-injunction statute.[26]  The test, rather, is
whether an Act of Congress, clearly creating a federal
right or remedy enforceable in a federal court of equity,
could be given its intended scope only by the stay of a
state court proceeding.  See *Toucey, supra,* at 132–134;
*Kline* v. *Burke Construction Co.,* 260 U. S. 226; *Provi-
dence & N. Y. S. S. Co.* v. *Hill Mfg. Co.,* 109 U. S. 578,
599; *Treinies* v. *Sunshine Mining Co.,* 308 U. S. 66, 78;
*Kalb* v. *Feuerstein,* 308 U. S. 433; *Bowles* v. *Willingham,*
321 U. S. 503.

With these criteria in view, we turn to consideration
of 42 U. S. C. § 1983.

### IV

Section 1983 was originally § 1 of the Civil Rights
Act of 1871. 17 Stat. 13.  It was "modeled" on § 2
of the Civil Rights Act of 1866, 14 Stat. 27,[27] and was
enacted for the express purpose of "enforc[ing] the Pro-
visions of the Fourteenth Amendment." 17 Stat. 13.
The predecessor of § 1983 was thus an important part
of the basic alteration in our federal system wrought
in the Reconstruction era through federal legislation
and constitutional amendment.[28]  As a result of the

---

[26] Cf. *Baines* v. *City of Danville,* 337 F. 2d 579 (CA4).

[27] See remarks of Representative Shellabarger, chairman of the
House Select Committee which drafted the Civil Rights Act of 1871,
Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871), and *Lynch* v.
*Household Finance Corp.,* 405 U. S. 538, 545 n. 9.

[28] In addition to proposing the Thirteenth, Fourteenth, and Fif-
teenth Amendments, Congress, from 1866 to 1875 enacted the follow-
ing civil rights legislation: Act of April 9, 1866, 14 Stat. 27; Act of
May 31, 1870, 16 Stat. 140; Act of April 20, 1871, 17 Stat. 13;
and Act of March 1, 1875, 18 Stat. 335.  In 1875, Congress also

new structure of law that emerged in the post-Civil War era—and especially of the Fourteenth Amendment, which was its centerpiece—the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established. *Monroe* v. *Pape,* 365 U. S. 167; *McNeese* v. *Board of Education,* 373 U. S. 668; *Shelley* v. *Kraemer,* 334 U. S. 1; *Zwickler* v. *Koota,* 389 U. S. 241, 245–249; H. Flack, The Adoption of the Fourteenth Amendment (1908); J. tenBroek, The Anti-Slavery Origins of the Fourteenth Amendment (1951).[29] Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.[30]

---

passed the general federal-question provision, giving federal courts the power to hear suits arising under Art. III, § 2, of the Constitution. Act of March 3, 1875, 18 Stat. 470. This is the predecessor of 28 U. S. C. § 1331.

[29] See generally Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich. L. Rev. 1323 (1952); Note, 75 Yale L. J. 1007 (1966); F. Frankfurter & J. Landis, The Business of the Supreme Court 65 (1928). As one commentator has put it: "That statutory plan [of the Fourteenth Amendment and Acts of Congress to enforce it] did supply the means of vindicating those rights [of person and property] through the instrumentalities of the federal government. . . . It did constitute the federal government the protector of the civil rights . . . ." TenBroek, at 185. See also *United States* v. *Price,* 383 U. S. 787, 801 n. 9; K. Stampp, The Era of Reconstruction (1965).

[30] As Representative Shellabarger stated, the Civil Rights Act of 1871 "not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship." Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871). And as Representative Hoar stated: "The principal danger that menaces us to-day is from the effort within the States to deprive considerable numbers of persons of the civil

240

. It is clear from the legislative debates surrounding passage of § 1983's predecessor that the Act was intended to enforce the provisions of the Fourteenth Amendment "against State action, ... whether that action be executive, legislative, or *judicial.*" *Ex parte Virginia,* 100 U. S. 339, 346 (emphasis supplied). Proponents of the legislation noted that state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights.

As Representative Lowe stated, the "records of the [state] tribunals are searched in vain for evidence of effective redress [of federally secured rights] .... What less than this [the Civil Rights Act of 1871] will afford an adequate remedy? The Federal Government cannot serve a writ of mandamus upon State Executives or upon State courts to compel them to protect the rights, privileges and immunities of citizens .... The case has arisen ... when the Federal Government must resort to its own agencies to carry its own authority into execution. Hence this bill throws open the doors of the United States courts to those whose rights under the Constitution are denied or impaired." Cong. Globe, 42d Cong., 1st Sess., 374–376 (1871). This view was echoed by Senator Osborn: "If the State courts had proven themselves competent to suppress the local dis-

and equal rights which the General Government is endeavoring to secure to them." Cong. Globe, 42d Cong., 1st Sess. 335.

Although, as originally drafted in 1871, § 1983's predecessor protected rights, privileges, or immunities secured by the Constitution, the provision included by the Congress in the Revised Statutes of 1874 was enlarged to provide protection for rights, privileges, or immunities secured by federal law as well. Rev. Stat. § 1979.

orders, or to maintain law and order, we should not have been called upon to legislate . . . . We are driven by existing facts to provide for the several states in the South what they have been unable to fully provide for themselves; *i. e.*, the full and complete administration of justice in the courts. And the courts with reference to which we legislate must be the United States courts." *Id.*, at 653. And Representative Perry concluded: "Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices . . . . [A]ll the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous things an injured party can do is to appeal to justice." *Id.*, at App. 78.[31]

Those who opposed the Act of 1871 clearly recognized that the proponents were extending federal power in an attempt to remedy the state courts' failure to secure federal rights. The debate was not about whether the predecessor of § 1983 extended to actions of state

---

[31] Representative Coburn stated: "The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices or bad passions or terror more easily. . . ." Cong. Globe, 42d Cong., 1st Sess., 460 (1871).

See also *id.*, at App. 85 (Rep. Bingham); 321 (Rep. Stoughton); 333–334 (Rep. Hoar); 389 (Rep. Elliot); 394 (Rep. Rainey); 429 (Rep. Beatty); App. 68–69 (Rep. Shellabarger); App. 78 (Rep. Perry); 345 (Sen. Sherman); 505 (Sen. Pratt); 577 (Sen. Carpenter); 651 (Sen. Sumner); 653 (Sen. Osborn); App. 255 (Sen. Wilson). Cf. *id.*, at 697 (Sen. Edmunds).

courts, but whether this innovation was necessary or desirable.[32]

This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts.

## V

Section 1983 was thus a product of a vast transformation from the concepts of federalism that had prevailed in the late 18th century when the anti-injunction statute was enacted. The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial." *Ex parte Virginia*, 100 U. S., at 346. In carrying out that purpose, Congress plainly authorized the federal courts to issue injunctions in § 1983 actions, by expressly authorizing a "suit in equity" as one of the means of redress. And this Court long ago recognized that federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights. *Ex parte Young*, 209 U. S. 123; cf. *Truax* v. *Raich*, 239 U. S. 33; *Dombrowski* v. *Pfister*, 380 U. S. 479. For these reasons we conclude that, under the

---

[32] See, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., 361 (Rep. Swann); 385 (Rep. Lewis); 416 (Rep. Biggs); 429 (Rep. McHenry); App. 179 (Rep. Voorhees); 599–600 (Sen. Saulsbury); App. 216 (Sen. Thurman).

criteria established in our previous decisions construing the anti-injunction statute, § 1983 is an Act of Congress that falls within the "expressly authorized" exception of that law.

In so concluding, we do not question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding. These principles, in the context of state criminal prosecutions, were canvassed at length last Term in *Younger* v. *Harris,* 401 U. S. 37, and its companion cases. They are principles that have been emphasized by this Court many times in the past. *Fenner* v. *Boykin,* 271 U. S. 240; *Spielman Motor Sales Co.* v. *Dodge,* 295 U. S. 89; *Beal* v. *Missouri Pac. R. Co.,* 312 U. S. 45; *Watson* v. *Buck,* 313 U. S. 387; *Williams* v. *Miller,* 317 U. S. 599; *Douglas* v. *City of Jeannette,* 319 U. S. 157; *Stefanelli* v. *Minard,* 342 U. S. 117; *Cameron* v. *Johnson,* 390 U. S. 611. Today we decide only that the District Court in this case was in error in holding that, because of the anti-injunction statute, it was absolutely without power in this § 1983 action to enjoin a proceeding pending in a state court under any circumstances whatsoever.

The judgment is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE WHITE and MR. JUSTICE BLACKMUN join, concurring.

I concur in the opinion of the Court and add a few words to emphasize what the Court is and is not deciding today as I read the opinion. The Court holds

only that 28 U. S. C. § 2283, which is an absolute bar to injunctions against state court proceedings in most suits, does not apply to a suit brought under 42 U. S. C. § 1983 seeking an injunction of state proceedings. But, as the Court's opinion has noted, it does nothing to "question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." *Ante*, at 243. In the context of pending state *criminal* proceedings, we held in *Younger* v. *Harris*, 401 U. S. 37 (1971), that these principles allow a federal court properly to issue an injunction in only a narrow class of circumstances. We have not yet reached or decided exactly how great a restraint is imposed by these principles on a federal court asked to enjoin state *civil* proceedings. Therefore, on remand in this case, it seems to me the District Court, before reaching a decision on the merits of appellant's claim, should properly consider whether general notions of equity or principles of federalism, similar to those invoked in *Younger*, prevent the issuance of an injunction against the state "nuisance abatement" proceedings in the circumstances of this case.