Ann E. **KELLY**, Plaintiff,

v.

**INTERMOUNTAIN PLANNED PARENT-HOOD, INC.,** Yellowstone Valley Womens' Clinic, Inc., City of Billings Police Department, **Defendants.**

**No. CV 92–186–BLG–JDS.**

United States District Court, D. Montana, Billings Division.

Dec. 14, 1992.

---

Nikolas T. Nikas, Tupelo, MS and Joseph A. Zavaletta, Billings, MT, for plaintiff.

Joel E. Guthals and Susan Fisher Stevens, Billings, MT, for defendants.

## FINDINGS OF FACT, MEMORANDUM AND CONCLUSIONS OF LAW

SHANSTROM, District Judge.

This matter is before the Court on plaintiff Ann E. Kelly's motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65. Ms. Kelly seeks to enjoin defendants Intermountain Planned Parenthood, Inc., Yellowstone Valley Womens' Clinic, Inc. (hereafter "The Clinics") and the City of Billings Police Department from taking any action preventing plaintiff "from peacefully and quietly praying (or engaging in other similar expressive conduct), including without limitation, enforcing, against any of plaintiff Ann E. Kelly's peaceful and quiet praying (or other similar expressive conduct), paragraph 3(a) of page 4 of that certain preliminary injunction order issued by the Thirteenth Judicial District Court, Yellowstone County, Montana, dated and entered on November 27, 1991 ..." The instant motion was briefed, a full evidentiary hearing was conducted on December 1, 1992, and the respective parties advanced oral argument in open court on that date.

Pursuant to Fed.R.Civ.P. 52, I submit the following Findings of Fact, Memorandum and Conclusions of Law.

### FINDINGS OF FACT

1. On November 14, 1991, the Clinics and other plaintiffs filed suit in Montana Thirteenth Judicial District Court, Yellowstone County (the "state action"), seeking damages and injunctive relief against certain defendants for allegedly unlawful conduct. The focus of the state action were activities and conduct normally associated with the national organization called "Operation Rescue."[1]

---

1. The typical activities normally associated with Operation Rescue are of significance in the case

Operation Rescue was a named defendant in the state action.

2. On November 27, 1991, a Montana state court judge issued a preliminary injunction in the state action. (*See* Preliminary Injunction, November 27, 1991, attached hereto as Exhibit A).

3. Among other things, the state action preliminary injunction prohibits individuals and/or groups "if on a public sidewalk or other public property: (a) From congregating or being within a corridor twenty-five feet wide beginning with the curb of said sidewalk and extending to the entrance to any of plaintiffs' (the Clinics) property or facilities at which health care services including abortion services are performed in the State of Montana." (*See* paragraph 3(a) of the state action preliminary injunction, page 4).

4. As a result of paragraph 3(a) of the state action preliminary injunction, individuals and/or groups were prohibited from "congregating" or walking on the public sidewalk contiguous to the Clinics' property. (*See* paragraph 3(a) of the state action preliminary injunction, page 4).[2] Any individual or group seeking to demonstrate against practices by the Clinics must do so on a public sidewalk across a public street to the side and front of the Clinics. (*See* Tp., page 36, paragraphs 15–25, page 37, paragraphs 1–3).[3]

5. Paragraph 8 of the state action preliminary injunction states: "All persons, including any person engaging in or about to engage in the conduct prohibited herein, shall be deemed to have been notified of this Order if such person has been personally served a copy of this Order, if a copy of this Order is posted on or about the exterior boundary of any such facility described here-

---

before the Court. The significance rests in the fact that Operation Rescue, without exception, advances its activities as a form of protest against abortion, a medical procedure which has been subject to protest by groups and individuals long before the advent of Operation Rescue and its tactics. In other words, not all forms of protest against abortion qualify as "Operation Rescue activities." Of necessity, therefore, this Court must carefully distinguish between protest activities normally associated with Operation Rescue and protest activities which are, and have always been, presumptively legal. This calls for conscientious consideration, but such a task is greatly aided in this case by the Clinics' previous work in the above-mentioned state action. The activities or conduct by Operation Rescue which the Clinics find objectionable and allegedly unlawful are based primarily on state law tort theories, including nuisance, trespass, assault, battery, and false imprisonment. (*See* Verified Amended Complaint filed in the state court action). The Clinics are even more specific in their briefing in the instant case. The activities they cite for Operation Rescue, and allege are "common knowledge," include "demonstrators throwing themselves upon clinic grounds and driveways, placing themselves in front of vehicles, attempting to enter clinic property, trapping occupants inside of vehicles and buildings, assaulting and battering patients and staff, stopping traffic, infiltrating clinic medical facilities, screaming, shouting, and spitting upon women coming to clinics for services, and upon clinic employees ..." (Brief of Defendants Intermountain Planned Parenthood, Inc., And Yellowstone Valley Womens' Clinic, Inc., In Support of Motion To Dismiss And In Opposition To Plaintiff's Motion For A Preliminary Injunction (hereafter

"Clinics' Brief"), pages 3–4; *see, also,* Transcript of Proceedings (hereafter "Tp."), December 1, 1992, page 16, paragraphs 18–23.). Plaintiff Ms. Kelly agrees, at least in part, with the laundry list of Operation Rescue activities offered by the Clinics when, in answer to the question, "What is Operation Rescue, in your words, Ms. Kelly?", she states, "Operation Rescue, from what I understand, is they lay on sidewalks and they chain themselves and block the doors like that." (Tp., pages 51–52). Moreover, the activities noted by the Clinics and Ms. Kelly comport with case law involving Operation Rescue. Thus, for the purposes of setting forth the Findings of Fact in the present action, I will adopt the Clinics' and Ms. Kelly's common understanding of Operation Rescue and the activities normally associated with that organization.

2. Paragraph 3(a) of the state action preliminary injunction makes no reference to the activities restricted by the twenty-five foot corridor with the exception of "congregating" or "being within."

3. The testimony is somewhat confusing on this issue. The police officer who arrested Ms. Kelly testified on direct that Ms. Kelly could not have demonstrated in the street (*see* Tp., page 36, paragraphs 15–25, page 37, paragraphs 1–3) and then equivocated on cross-examination. (*See* Tp., page 46, paragraphs 23–25, page 47, paragraphs 1–2). As a practical matter, if not a legal one, the state action preliminary injunction requires that individuals and/or groups go across a public street, well beyond twenty-five feet, if they wish to protest the activities of the Clinics.

in in plain view, or if this Order is read aloud to such person by Plaintiffs' representative or by an authorized law enforcement officer." (*See* paragraph 8 of the state action preliminary injunction, page 5).

6.  Ms. Kelly is not a named party in the underlying state action. (*See* Verified Amended Complaint; *see, also,* Tp., page 51, paragraphs 3–5). She is not an attorney, agent or employee of any of the named parties in that action. (*See* Tp., page 51, paragraphs 8–14). She is not a member of Operation Rescue, nor has she ever been involved in the typical activities normally associated with that organization. (*See* Tp., page 51, paragraphs 15–25, page 52, paragraphs 1–5; *see, also,* page 54, paragraphs 8–25, page 55, paragraphs 1–25, page 56, paragraphs 1–13, page 63, paragraphs 21–25, page 64, paragraphs 1–2).[4]

7.  Ms. Kelly was not personally served a copy of the state action preliminary injunction, nor was the preliminary injunction read aloud to her by the Clinics' representative or by an authorized law enforcement officer. At the time of her arrest, Ms. Kelly knew of the existence of the state action preliminary injunction. She had seen the first page of the preliminary injunction, had seen it from a distance posted on the Clinics' property, but she was unaware of the terms of the preliminary injunction.[5] (*See* Tp., page 36, paragraphs 4–11, page 59, paragraphs 23–25, page 60, paragraphs 1–25, page 61, paragraphs 1–25, page 62, paragraphs 1–5; *see, also,* page 72, paragraphs 18–25, page 73, paragraphs 1–25).

8.  Copies of the state action preliminary injunction were posted on the Clinics' property after its issuance on November 27, 1991. The copies cannot be read without "being within" the twenty-five foot corridor established in paragraph 3(a) of the state action preliminary injunction. (*See* Tp., page 59, paragraphs 5–25, page 60, paragraphs 1–17, page 73, paragraphs 1–25, page 74, paragraphs 1–2).

9.  On August 27, 1992, Ms. Kelly was arrested by officers of the City of Billings Police Department and charged with criminal contempt of the state action preliminary injunction. Specifically, Ms. Kelly was charged with violating paragraph 3(a) of the state action preliminary injunction. (*See* Tp., page 42, paragraphs 2–5, paragraphs 10–24).

10.  At the time of her arrest, Ms. Kelly was standing alone on the public sidewalk near the front of the Clinics, peacefully praying her rosary. (*See* Tp., page 39, paragraphs 24, 25, page 40, paragraphs 1–25, page 41, paragraphs 1–17; *see, also,* page 45, paragraphs 13–24, page 52, paragraphs 6–13). If she had not been within the twenty-five foot corridor of paragraph 3(a) of the state action preliminary injunction, Ms. Kelly would not have been arrested. (*See* Tp., page 42, paragraphs 2–4, paragraphs 17–24, page 49, paragraphs 11–13; *see, also,* page 109, paragraphs 4–6).

11.  Prior to Ms. Kelly's arrest on August 27, 1992, she had peacefully prayed and demonstrated on the sidewalk[6], within the twen-

---

4.  Excessive time and attention, by the Clinics in briefing and at the hearing on the preliminary injunction, was devoted to establish the fact that Ms. Kelly was a "member" of Operation Rescue, or somehow associated with its typical protest activities. No credible evidence of "membership" or such association was presented. All the credible evidence was to the contrary. No evidence was presented by the Clinics that Ms. Kelly ever involved herself in the typical activities normally associated with Operation Rescue, as understood and objected to by the Clinics. The only evidence presented arguably contrary to this finding was Ms. Kelly's admission that she knows a certain individual commonly known to be involved with Operation Rescue, her presence in front of the Clinics during a week of mildly Operation Rescue-type activities and her reference to her prayer activities as a "rescue." Even

taken together, this evidence does not give rise to a factual finding that Ms. Kelly ever involved herself in the typical activities normally associated with Operation Rescue.

5.  Evidence exists in the record of the December 1, 1992 hearing that Ms. Kelly was never informed that walking and praying on the sidewalk in front of the Clinics was violative of the state action preliminary injunction. Rather, she was advised by a law enforcement officer that she could not "picket" inside the twenty-five foot corridor. (*See* Tp., page 55, paragraphs 7–25, page 56, paragraphs 1–20, page 37, paragraphs 4–23, page 129, paragraphs 9–15).

6.  No credible evidence was presented linking Ms. Kelly with any forms of expressive conduct or protest other than traditional forms such as pub-

ty-five foot corridor, on many occasions. (*See* Tp., page 66, paragraphs 1–25, page 67, paragraphs 1–20). Although the state action preliminary injunction was in effect on all occasions when Ms. Kelly had previously prayed and/or demonstrated, it had never been enforced by the City of Billings Police Department or the Clinics. (*See* Tp., page 67, paragraphs 9–19, page 75, paragraphs 17–25, page 76, paragraphs 1–3; *see, also,* page 124, paragraphs 12–14).

12. Prior to Ms. Kelly's arrest on August 27, 1992, nine months after the issuance of the state action preliminary injunction, paragraph 3(a) had not been enforced so as to result in a single arrest. (*See* Tp., page 48, paragraphs 9–21).

13. On the morning of Ms. Kelly's arrest, the decision to enforce the twenty-five foot corridor originated with personnel from the Clinics. (*See* Tp., page 31, paragraphs 9–25, page 120, paragraphs 8–14; *see, also,* page 166, paragraphs 16–20).[7] The decision by the Clinics to enforce paragraph 3(a) of the state action preliminary injunction was based on the "totality of the circumstances" (*see* Tp., page 134, paragraphs 5–8) and those circumstances include, but are not necessarily limited to, how clinic patients feel about the demonstrations occurring around the Clinics (*see* Tp., page 116, paragraphs 3–11, paragraphs 22–25, page 120, paragraphs 17–20; *see, also,* page 123, paragraphs 16–20, page 166, paragraphs 16–20), and the content of the speech uttered by demonstrators. (*See* Tp., page 96, paragraphs 11–25, page 97, paragraphs 1–25, page 98, paragraphs 1–25, page 99, paragraph 1, page 130, paragraphs 14–25, page 131, paragraphs 1–4, page 157, paragraphs 15–22, page 159, paragraphs 20–25).[8]

---

lic prayer, peaceful picketing, and talking with persons regarding her protest activities. These activities are clearly distinguishable from the typical activities normally associated with Operation Rescue. (*See* Footnote number 1, *supra*).

**7.** On August 27, 1992, the City of Billings police officers who arrested Ms. Kelly saw nothing at the Clinics that had not occurred on many days since the issuance of the state action preliminary injunction. In fact, they witnessed no activities they deemed unlawful except Ms. Kelly's peaceful praying within the twenty-five foot corridor. The complaints of that morning originated with the Clinic manager, Chris Anderson, who, herself, had not personally witnessed what she told the City of Billings Police Department. (*See* Tp., page 33, paragraphs 19–24, page 37, paragraphs 4–19, page 115, paragraphs 23–25, page 116, paragraphs 1–5). The evidence reflects that Ms. Anderson decided to enforce the injunction on August 27, 1992 because some of her patients were upset at the protest occurring that morning. (*See* Tp., page 120, paragraphs 15–20). Why the morning of August 27, 1992, which involved only mild activities of protest by any standard, would evoke a decision to enforce the twenty-five foot corridor requirement was unclear in briefing and testimony on this matter.

**8.** Based on a review of extensive briefing and a thorough day-long testimonial evidentiary hearing, it is very difficult, if not impossible, to determine with any degree of certainty when, and if, the Clinics and City of Billings Police Department will enforce paragraph 3(a) of the state action preliminary injunction in the future. The City of Billings Police Department has never enforced it without the urging of the Clinics and the Clinics' officers themselves state that they may not enforce it in the future. (*See* Tp., page

136, paragraphs 3–5, page 155, paragraphs 7–10, page 156, paragraphs 14–22; *see, especially,* the calculated ambiguity with which Ms. Anderson addressed this question in the December 1, 1992 hearing, page 136, paragraphs 20–25, page 137, paragraphs 1–20). The confusion on who is to apply the injunction, when, and how, is illustrated by the Clinics' own counsel when he argues that the "injunction has to be interpreted by people based upon actions of the parties involved." (*See* Tp., page 167, paragraphs 23–24). The context of counsel's statement seems to indicate that he is referring to judicial interpretation of the *meaning* of the injunction, rather than its even-handed application. (*See* Tp., page 167, paragraphs 24–25, page 168, paragraphs 1–3). If that is what is meant, then the actions of the parties have no relevancy to interpretation of the meaning of an injunction. However, the testimony of Clinics' staff and the rest of counsel's argument reflect significant confusion with regard to how and by whom a judicial injunction is to be enforced. (*See, especially,* Tp., page 168, paragraphs 17–19, where counsel argues that the injunction must have a general application and yet the record clearly reveals it has *not* been "generally applied." Counsel even states that *his clients* "have been quite liberal in their application of the injunction" (*see* Tp., page 164, paragraphs 18–20), apparently inferring that the authority to enforce the injunction rests with his clients rather than law enforcement officials and his clients have only chosen to enforce it once (Ms. Kelly) when they could have on many other occasions.) In light of statements like these, it is difficult to determine what role counsel expects of the City of Billings Police Department unless it is simply to administrate the power necessary to carry out the will of the Clinics.

14. Ms. Kelly is presently awaiting trial in state court on charges of criminal contempt for violation of paragraph 3(a) of the state action preliminary injunction.

### MEMORANDUM

■ While the nature and length of the December 1, 1992 hearing before this Court required a detailed set of factual findings, it also raised a threshold question that must be addressed before this federal court may be appropriately asked to address Ms. Kelly's request for a preliminary injunction. The question is, "What effect, if any, will the granting of a preliminary injunction in this case have on the pending state court action against Ms. Kelly for criminal contempt?" I find that, regardless of plaintiff's protestations to the contrary, any action by this Court will affect, to some degree, the pending state court proceeding.

■ When an injunction against a state court criminal proceeding is sought under 42 U.S.C. § 1983, "the principles of equity, comity, and federalism" must restrain a federal court. *Mitchum v. Foster,* 407 U.S. 225, 243, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972). The fact that Ms. Kelly has not specifically sought to enjoin the pending criminal contempt proceedings in state court does not obviate the need to address federalism questions. Even when the prayer for injunctive relief does not seek to enjoin the state criminal proceedings themselves, the principles of equity caution against the grant of an injunction except in the most "extraordinary circumstances." *See Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976).

■ Upon careful review, I find it advisable to abstain from entertaining the present suit under the line of cases dealing with "equitable abstention," commencing with *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Those cases impose heightened requirements for an injunction to restrain an already-pending state criminal action. Specifically, *Younger* and its progeny stand for the proposition that a federal court "may not enjoin a pending state criminal proceeding in the absence of special circumstances suggesting bad faith, harassment or irreparable injury that is both serious and immediate." *Gibson v. Berryhill,* 411 U.S. 564, 573–74, 93 S.Ct. 1689, 1695, 36 L.Ed.2d 488 (1973).[9] Ms. Kelly has not carried her burden of showing the presence of special circumstances in this case. Indeed, while plaintiff did argue that her alleged irreparable injury was both "great and immediate," such an assertion was substantially diluted by Ms. Kelly's request that this Court stay any ruling on the instant preliminary injunction until the conclusion of the pending state court proceedings. That request can only be understood as a tacit admission that Ms. Kelly's alleged irreparable injury is not so great and immediate as to demand this Court's imminent attention.[10]

■ Having so concluded, I must recognize the fact that were I to grant the relief requested by Ms. Kelly, the result would be to interfere, to some degree, with a pending criminal proceeding, without the existence of special circumstances required by *Younger* and its companion cases. Moreover, to stay any ruling pending the conclusion of the criminal contempt trial would undermine the principles of equity, comity, and federalism foundational to the concept of "equitable abstention." The reason a federal court abstains in such a situation is to acknowledge and protect the delicate balance between a federal court exercising its lawful jurisdiction and a state administering its own law. Even an implication by the federal court that a litigant may not receive an adequate remedy in state court is inappropriate. Staying any

---

**9.** There are actually four possible exceptions to the *Younger* doctrine: bad faith, a motivation of a desire to harass, a challenged statute expressly violative of a constitutional prohibition, or irreparable injury that is great and immediate. *Moore v. Sims,* 442 U.S. 415, 423–24, 99 S.Ct. 2371, 2377–78, 60 L.Ed.2d 994 (1979). Ms. Kelly chose only to assert irreparable injury as a clear exception to *Younger* primarily because of plaintiff's allegation that *Younger* does not apply to her federal claim due to the relief requested.

**10.** It also misapprehends the concept of "pending proceedings" for *Younger* purposes, which traditionally include appellate proceedings.

794

ruling in the instant case may be understood as such an implication.

 It is axiomatic that no rule of equity should be applied in blind disregard of fact. That is the reason Ms. Kelly was afforded the opportunity, in a lengthy evidentiary hearing, to establish the special circumstances necessary, if such circumstances exist, to overcome the concerns of comity and federalism. Although Ms. Kelly did establish the factual basis for a plausible claim of constitutional infringement, she did not establish any special circumstances in this case warranting federal intervention. As I understand *Younger* and *Mitchum,* even a plausible claim of constitutional infringement does not automatically entitle one to avail himself or herself of the injunctive processes of the federal courts when criminal proceedings are pending in state court.

It should be carefully noted that my decision in this case does not constitute abnegation of judicial duty. Rather, it is a wise and productive discharge of it. The merits of Ms. Kelly's action *will* be addressed by a court of law. My decision is effectively a postponement of decision in deference to the state forum.[11] That is why abstention is narrowly drawn to meet the particularized need it serves. The federal courts remain open to Ms. Kelly to present her federal claim should the state court fail to afford relief.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction pursuant to 42 U.S.C. § 1983.

2. Federal courts should not interfere with state court criminal proceedings in the absence of special circumstances suggesting bad faith, a motivation of a desire to harass, a challenged statute expressly violative of constitutional prohibitions, or irreparable injury that is both "great and immediate." *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *Gibson v. Berryhill,* 411 U.S. 564, 93

S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979).

3. In the absence of any of the special circumstances noted above, abstention is required in this case.

Based on the foregoing,

**IT IS ORDERED** that defendant Clinics' motions to dismiss the above-entitled action on equitable abstention grounds is granted. Such dismissal is without prejudice. The Clerk of Court is directed to enter judgment accordingly.

The Clerk of Court shall forthwith notify the parties of the making of this order.

---

**11.** The state courts are capable of fairly and fully adjudicating the federal issues that come before    them.