**Jean CARAMICO et al., Plaintiffs,**

**v.**

**George W. ROMNEY, Secretary of the Department of Housing and Urban Development, et al., Defendants.**

**No. 72 C 901.**

United States District Court,
E. D. New York.

Nov. 6, 1972.

Supplemental Opinion June 13, 1973.

Judgment affirmed, 2 Cir., 509 F.2d 694.

Douglas J. Kramer, Brooklyn, and Richard A. Huffman, New York City (John C. Gray, Jr., Brooklyn Legal Services Corp. B, Brooklyn, of counsel), for plaintiffs.

Harold J. Friedman, and Cyril Hyman, New York City (Robert A. Morse, U. S. Atty., of counsel), for defendants, Secretary, Commissioner, Regional Administrator, and Realty Officer.

Dean J. Landau, New York City (Cadwalder, Wickersham & Taft, John J. Walsh, and Donald G. Glascoff, Jr., New York City, of counsel), for defendant F. N.M.A.

Frederick Weinberger, Counsel to the Sheriff of the City of New York, New York City, for defendants Kehl and Jacobs.

## MEMORANDUM INCORPORATING FINDINGS of FACT and ORDER

DOOLING, District Judge.

Plaintiffs by their amended complaint seek injunctive and declaratory relief on behalf of the plaintiffs with respect to the plaintiffs' rights, if any, (A) under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 et seq., and (B) with respect to the waiver of the vacancy requirement set forth in 24 C.F.R. § 203.381 (as related to 12 U.S.C. §§ 1709, 1710(a) and the "Property Disposition Handbook, One to Four Family Properties," Chapter 4 paragraph 91, R.H.M. 4310.5).

It is not denied at this time, and it is preliminarily found, that the plaintiffs' situations with respect to the property that they are occupying or have recently occupied have been the following.

Jean Caramico lives in a two-floor two-family house subject to foreclosure proceedings based on an F.H.A. insured mortgage (12 U.S.C. § 1709; the defendant Realty Officer of the Department of Housing and Urban Development, F.H.A., has determined that the secretary of Housing and Urban Development will not accept the building with tenants in occupancy, and, on plaintiff Caramico's appeal, the Assistant Secretary of the Department of Housing and Urban Development has determined that his department requires the property to be vacant before delivery in order that it may be renovated and resold. Plaintiff Caramico is (and other plaintiffs are) in consequence faced with motions for orders of possession in the State Supreme Court which will result in her (and their) being removed from the two to four family houses which she is (and they are) occupying or, until recently, did occupy; in one such case relief has been denied in the State Courts both at Special Term (see, Federal National Mortgage Association v. Rivera, August 14, 1972, Kings County, Index No. 16,143–1970), and in the Appellate Division.

Plaintiff Caramico, or if not she, others similarly situated, have in this situation applied to the defendant's Secretary for assistance under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 and has or have been uniformly denied such relief on the explicit ground that the Relocation Act does not apply to persons situated as are the plaintiff Caramico and other plaintiffs.

Plaintiffs Olivieri and Rivera, informed by the defendant Sheriff's office on June 5, 1972, that they would be evicted on June 13, 1972, sought a stay of eviction on the basis that there was no showing of compliance with the Relocation Act; and that motion was denied by Mr. Justice Damiano in the Supreme Court, Kings County, on August 14, 1972, and a stay was denied in the Appellate Division in the early days of October, 1972.

Plaintiff Long occupied an apartment in a now foreclosed property that was the subject of a re-possession order entered March 13, 1972, in the Supreme Court, Kings County; he managed to secure a reservation in public housing at a rental a little over $50 higher than his rental had been in the foreclosed premises. He applied to the Secretary for assistance under the Relocation Act, pointing out that the eviction took place pursuant to 24 C.F.R. § 203.381 and the Department refused assistance on the ground that it had determined that the Relocation Act did not apply to plaintiff Long in the situation in which he was involved. It was added that the issue was currently being litigated by the De-

partment, and that it was inappropriate to make any extended comment.

Plaintiff Maggie Evans had for 2½ years been a tenant at 103 Pioneer Street, Brooklyn, New York, along with her 8 children when on November 10, 1971, she was served by defendant F.N. M.A. with a demand to quit and surrender her apartment within 10 days. She did not do so, and after one motion for an order of assistance was lost, plaintiff applied to the Secretary, to the Regional Administrator and to the Realty Officer for a waiver of the vacant-possession requirement of 24 C.F.R. § 203.381. The applications were made pursuant to paragraph 91 of chapter 4 of the Handbook and pursuant to the 5th Amendment to the Constitution, on the ground that the building in which plaintiff Evans resided was a two-to-four family dwelling, that continued occupancy was necessary to prevent vandalism, that dispossession of the tenants would present no advantage insofar as immediate occupancy by a purchaser was concerned, and that dispossession of the tenants would be inconsistent with the National Housing Act as amended. (12 U.S.C. § 1701 et seq.) The defendant Realty Officer responded that after a complete inspection of the building by staff personnel it had been determined that the Secretary would not accept the building with tenants in occupancy. A rehearing was sought before the Secretary and was denied in the same communication which denied the comparable application of the plaintiff Caramico. Plaintiff Evans then applied for assistance under the Relocation Act and the Secretary denied relief as in the case of the plaintiff Long.

Plaintiff Henrique, similarly made the object of a motion for an order of possession, similarly applied for a waiver of the vacant-possession requirement but received no response. Plaintiff Henrique then applied for relocation assistance under the Relocation Act and that relief was denied by the Secretary on August 23, 1972.

Plaintiffs Ayala, with their four children occupants of an apartment for over 8½ years, were served with a motion for an order of possession, and, when that motion was withdrawn, they applied for a waiver of the vacant-possession requirement and were denied it by the defendant Realty Officer. There had been no answer to plaintiff's appeal to the Secretary and application for assistance under the Relocation Act at the time of action commenced.

Plaintiff's affidavits show that the situation in which the plaintiffs have found themselves appears to be one of common occurrence, and is particularly so in Brooklyn, where, plaintiffs aver without contradiction, defendant F.N. M.A. alone has obtained eighty orders for possession in July and August 1972 and an additional twenty-one orders in the first week of September 1972.

Plaintiffs sought and were denied a temporary restraining order directed to the City Sheriff against his executing orders of possession issued in the State Supreme Court. After the temporary restraining order was refused, in principal part on the ground that an application for a stay was pending in the Appellate Division, Second Department, the Appellate Division denied a stay, and the plaintiff accordingly pressed the motion for a preliminary injunction against the Sheriff's office and for an order making the case a class action as provided in Rule 23(c). For the reasons set forth in the Memorandum and Order in the parallel case of Manners v. Secretary, D.C., 333 F.Supp. 829, no order under Rule 23(c)(l) will be made in the instant case.

Exactly as in the *Manners* case the present case does present questions of general and recurrent interest and importance, particularly in this area which suffers so obviously from housing problems, relocation needs, and those other related urban ills which so much of the Congressional Legislation of recent years has sought in a variety of ways to remedy. Plaintiffs' case presents causes

‧

of action both under the Relocation Act and under 24 C.F.R. § 203.381 and 12 U.S.C. §§ 1709, 1710. It differentiates from the *Manners* case in that the plaintiffs here, or some of them, have pursued their administrative remedies under 24 C.F.R. § 203.381 as best they could, given the absence of any official administrative pathway, and have supplemented such applications by applications apparently made in proper form under the Relocation Act. The case, taken with the *Manners* case, can therefore afford a framework for decision on the rights of tenants in two-to-four family houses which are under foreclosure to obtain a federal due process determination on the need for eviction; in addition, of course, the instant case raises at once the question of whether the Relocation Act applies to persons in the position of plaintiffs.

■ 1. It is concluded that the Relocation Act has no application to persons, like the plaintiffs, who are required to relocate by reason of federal decisions taken in the context of federal acquisition of housing which received federal assistance in the form provided by 12 U.S.C. § 1709 et seq. (providing for insurance on mortgages which come within the description of 12 U.S.C. § 1709(b)(2) which have been made to or held by approved mortgagees and which otherwise comply with the provisions of Section 1709(b)).

The Relocation Act by its own terms establishes a policy for fair and equitable treatment of persons displaced "as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole." 42 U.S.C. § 4621. Hence, Sections 4622, relating to moving and other expense, and 4625, relating to relocation assistance advisory services, commence with the expression "Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971"; the sections then go forward with their substantive provisions. Section 4624, contemplating payments up to $4,000 to enable persons other than homeowners to relocate, speaks in terms of persons who have been in occupancy of the displaced property "for not less than ninety days prior to the initiation of negotiations for acquisition of such dwelling" indicating, although only generally, a reference to the normal preliminary to condemnation proceedings. See particularly 46 U.S.C. § 4651(1). Section 4601(6) defines "displaced person" as a person affected "as a result of the acquisition of . . . real property . . . for a program or project undertaken by a Federal agency, or with Federal financial assistance;" and, under Section 4601(4), "Federal financial assistance" is defined as meaning a grant, loan or contribution provided by the United States "except any Federal guarantee or insurance."

■ The language framework of the statute is, thus, not at all descriptive of the involuntary acquisition by the government of foreclosed real estate from an insured mortgagee who tenders it in order to receive the insurance provided by 12 U.S.C. § 1709. No matter how numerous may be the acquisitions of such foreclosure properties, they cannot fairly be thought to constitute a Federal project or program, and, while one consequence of Federal financial assistance, is, regretably, foreclosures and acquisitions of land by the Federal government, the ultimate land acquisition cannot be said to be "federally assisted."

Undeniably many of the provisions of sections 4601 and following could apply very happily to persons who are removed from foreclosed properties, but the Relocation Act is not addressed to their situation.

■■ It is argued that, if the Relocation Act as drafted does not extend to persons situated as are the plaintiffs, it should be so interpreted, because to deny the Act such an inclusive interpretation would be to deny to persons situated—in a practical sense—exactly as are the persons within the clear compass of the Act, benefits which

the former group's similarity of situation would constitutionally entitle them to share. The argument has its attractions, but it becomes an argument that if Congress has done much it must do more. The Relocation Act itself deals with a rationally defined class of persons affected by one type of governmental action, and the failure of the Congress to include an additional class, the plight of the members of which is similar but who do not otherwise share the defining characteristics of the class provided for, is not unconstitutional action. The removal of people from existing housing in order to raze it and create new housing of a kind which may not be available to the displaced persons presents a substantially different situation for legislative treatment from the situation of tenants removed in individual foreclosure cases. The fact that in certain areas, as in parts of Kings County, the displacements may be numerous because of neighborhood deterioration is an unintended and undesired consequence which does not flow from governmental action, notwithstanding that governmental action in the administration of such provisions as Section 203.-381 may, in some regions, result in large scale acquisitions, each one of which nevertheless remains equally an involuntary acquisition not controlled by governmental initiative.

It is concluded, therefore, that the Relocation Act does not have any application to persons in the situation of the plaintiffs, and that it does not have to be interpreted so as to cover them in order to avoid invalidity.

■■ 2. The motion for a preliminary injunction against the Sheriff and Deputy Sheriff must be denied. Each of the foreclosure actions in which an order for possession has been sought afforded an equal and complete opportunity to present defenses based on the Relocation Act and the failure of the defendant Secretary to adopt a structured procedure with respect to making or waiving his demands for vacant-possession under 12 U.S.C. § 1710(a) that would be characterized by adequate due process.

There is no escape here from the strictures of 28 U.S.C. § 2283. The case would not have been within Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, even without the perhaps narrower reading of that case presented in Younger v. Harris, 1971, 401 U.S. 37, 49–50, 53, 91 S.Ct. 746, 27 L.Ed.2d 669. More recently in Mitchum v. Foster, 1972, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705, the Court, while dispelling the notion that Younger v. Harris meant that no state criminal cases could ever be enjoined, carefully noted the circumstances in which the explicit language of Section 2283 could be extended by implication, and concluded that the Civil Rights section, 42 U.S.C. § 1983 is an Act of Congress falling within so much of Section 2283 as excepts from its prohibition injunctions to stay proceedings in the State Court which are expressly authorized by Acts of Congress. But in no real sense is the present case a Section 1983 case. In a formal way plaintiffs assert that the State Courts are proceeding under color of their own law to deprive the plantiffs of rights which the plaintiffs have asserted under Federal Law. However, plaintiffs at best complain, in this respect, that the State Courts have disagreed with their interpretation of the Federal Law, that the State Courts have judicially determined that plaintiffs have not the claimed Federal rights. Such determinations by a State Court are not conduct which can be treated as enjoinable under Section 1983; plaintiff's complaint is of judicial error and not of an invasion of federal constitutional or other federal rights under color of State Law. Moreover, the underlying and ultimate complaint of plaintiffs is that federal officers have refused to recognize that plaintiffs have the rights which they have asserted. The gravamen of the present action is the denial by the defendant Federal Officers of the rights which the plaintiffs have asserted. And, in any event McGuane v. Chenango Court, Inc., 2d Cir. 1970, 431 F.2d 1189, precludes a holding here that there is action under color of State Law

in New York's providing F.N.M.A. with the same right to evict tenants by court proceedings that New York gives to all other landlords.

3. The likelihood that the case is not one within Section 1983 raises problems of jurisdiction common to this case and to the *Manners* case. Counsel must soon turn their attention to those matters. Jurisdiction under 28 U.S.C. § 1331 requires assurance that the jurisdictional amount requirement can be met by each individual plaintiff. Under 28 U.S.C. § 1361 a jurisdiction could well exist to compel the defendant Federal Officers, pursuant to 42 U.S.C. § 4633(b)(3) to entertain and pass on the merits of the Relocation Act claims that have been rejected. The question whether a class of persons or of displacement instances is or is not within the Relocation Act may be thought to present a plain and unembarrassed issue of law which can be fully and adequately tested by a proceeding in the nature of mandamus. The proceeding could not result in making a particular award nor in review of action taken to grant or deny claims, where the basis of such action was that the applicants were within the statute but not eligible for relief on the particular facts of their individual cases.

Finally in the FOURTH cause of action pleaded in the amended complaint plaintiffs Evans, Caramico and Ayala seek review of the action of the Realty Officer and of the Secretary as final administrative actions denying them relief to which they are in law entitled. The intimation is of review sought under 5 U.S.C. § 703, and possibly, there is an occasion for inquiring, more generally, whether mandamus may not lie to compel appropriate initiation of procedural rule making pursuant to 5 U.S.C. § 553 in implementation of 24 C.F.R. § 203.381 and the related Handbook provisions. While the reference to the Administrative Procedure Act may not necessarily solve jurisdictional problems, it does appear that it will be necessary at the next stage in the case and before the trial

date to have clarified the issues of jurisdiction that are present.

It is

Ordered that the Motion for a preliminary injunction against the action of the defendants Kehl and Jacobs is denied and the motion for an order under Rule 23(c)(1) declaring that the action may be maintained as a class action is denied.

## SUPPLEMENTAL OPINION

The remaining matter for disposition is the motion of the plaintiffs and intervenors for a preliminary injunction restraining the defendants, their employees and agents from evicting or requiring or causing the eviction of the plaintiffs and the intervenors until the defendants shall have established a legally and constitutionally adequate procedure to consider and decide plaintiffs' and intervenors' requests for waiver of the defendants' "vacancy requirement" (24 C.F.R. 203.381), and until the defendant officers of the Department of Housing and Urban Development have in fact ruled on the plaintiffs' and intervenors' requests for waiver of the requirement of vacant delivery.

It was determined by the Memorandum and Order of November 6, 1972, filed November 8, 1972, that the action was not maintainable as a class action, for reasons set forth in passing on the class action motion in the parallel action of Manners v. The Secretary (71 C 550), and that the claims presented under the Relocation Act were not valid. It was noted that a jurisdiction appears sufficiently to exist with respect to the fourth cause of action, both as it sought review of administrative action under 5 U.S.C. § 703 and as in the nature of a claim for mandamus to compel the initiation of procedural rule-making pursuant to 5 U.S.C. § 553 in implementation of 24 C.F.R. Section 203.381 and the related Handbook and Manual provisions respecting the procedures to be employed in mortgages affecting two to four family properties. *Cf.* 28 U.S.C. §

1361. In the Memorandum and Order of January 3, 1973, filed January 4, 1973, the motion of the Federal defendants for an order dismissing the amended complaint was denied, essentially on the grounds set forth in the earlier memorandum with respect to the review of the Secretary's action on the Requests for Waiver of the vacant delivery requirement and the matter of requiring the Secretary to initiate rule-making procedures governing the Department's action on the vacant possession issue. The general background appears in the reported decision in the parallel case of Manners v. Secretary, D.C., 333 F.Supp. 829, and the more particular facts out of which the claims of the plaintiff arise were found, and are again found, as set forth in the Memorandum filed in this case on November 8, 1972.

The facts and background of the present case are essentially those of Manners v. Secretary, and these have been set forth fully in the memorandum of May 16, 1973. Since the present case, on the issues now present for decision, is really a simple extension of the issues in the *Manners* case, what was said in the May 16, 1973, Memorandum will not be repeated here, but the finding in *Manners* must be regarded as essentially forming a part of the present determination, with the cautionary note that the present case is not restricted to instances arising in the East New York area but to properties of similar sorts wherever located in the area of the Hempstead insuring office, and that, in the present case, the efforts to obtain articulate action directly from the Secretary and a statement from him of his grounds of action and adequate review were made explicit and clear-cut.

Reference, finally, should be made to the motions of the applicants, Juanita Anderson, et al. for intervention, motions that were granted by the Memorandum of February 14, 1973. Each of the intervenors, before dispossession, made a Request for Waiver of the vacancy requirement directly to the HUD insuring office, attention of the Real Property Officer, of the Department of Housing and Urban Development, with copy to the Secretary in Washington and to Federal National Mortgage Association, the mortgagee of the properties in question. Certain of the Requests were addressed also to the Regional Administrator of the Department. All of the Requests identified the foreclosure action involved, the premises by street address, and the more recent also identified the servicer or some other person, such as the counsel, evidently interested in the property, its foreclosure or its management. None of the Requests gave the specific HUD identifying number, which is the easiest means for the Secretary and HUD generally readily to locate their records respecting properties, but it does not appear that an occupier or tenant was in any position to know and furnish that identifying number. All the Requests for Waiver sought a hearing and a decision on the "right" to remain as a tenant or as tenants in the property identified by its address and explicitly demanded the Waiver of the vacant delivery requirement of 24 C.F.R. § 203.381 pursuant to (a) paragraph 91, Chapter 4 of the HUD Property Disposition Handbook, One to Four Family Properties, RHM 4310.5 and (b) the due process clause, on the ground that the premises constituted a two to four family dwelling, that continued occupancy was necessary to prevent vandalism, that dispossession would present no advantage so far as immediate occupancy by a buyer was concerned and that dispossession would be inconsistent with the National Housing Act, as amended. The Request in each instance incorporated a demand upon FNMA that it request the Department of Housing and Urban Development for permission to allow continued tenancy pursuant to the Property Disposition Handbook.

The Requests for Waiver run from dates in 1970 through February 13, 1973. The affidavits filed March 5, 1973 show that at least eighteen of the intervenors were at that date still in posses-

sion in the insured properties; the affidavits indicate the length of time that the tenancy had existed and expressed the occupant's desire to continue in possession.

Permission to convey the property occupied, or to permit the property, if already conveyed, to remain occupied has been denied to the mortgagee, FNMA, in the case of each intervenor and the intervenor has been advised that eviction is imminent. None of the intervenors has received any direct communication from the Secretary or the other officials of HUD.

The Federal defendants are clear that in none of the cases is the Department prepared to accept the property in any condition other than vacant. If title has already been conveyed and the tenants are still in possession, the Department insists upon eviction, and it reserves the right to reconvey the property to FNMA if the condition of vacancy is not produced. The Department is clear that it does not accept requests directly from occupants.

The facts respecting the occupancy and occupancy history of the plaintiffs originally in the case are set forth in the Memorandum and Order of November 6-8, 1972, and certain additional information respecting some of the occupants has been brought to light since the entry of that order. As indicated in the earlier findings, in the cases in which the Department did respond to communications from counsel for the occupants, the position was taken that there had been a complete inspection of the building by staff personnel and that it had thereafter been determined that the Secretary would not accept the building ocupied; there was—also—assertion of the idea in certain cases that the Department had determined after complete inspection, that required repair work, necessary before resale, dictated the requirement that the properties be vacated so that they could be renovated and resold.

The premises in which plaintiff Jean Caramico was a tenant at 90 Dikeman Street, Brooklyn, were apparently the subject of a mortgage made some short time before May 1, 1970; the mortgage was insured under Section 223(e) of the National Housing Act, 12 U.S.C. § 1715n(e). The mortgagor was Juan Roman and the Department was notified under date of April 1, 1971 that the mortgage was in default, that there were seven past-due payments and that foreclosure was imminent. A second report under date of August 5, 1971, reported that a twelfth payment was past-due and that foreclosure had been commenced. (It is possible that the latter notice was not received by the Department until February 28, 1972.) The property was apparently transferred to HUD under date of February 11, 1972; it was reported that the unpaid principal at the date foreclosure was instituted was $16,869.03 and that the last completely paid installment was that of August 1, 1970. The property was conveyed occupied. Apparently on April 10, 1972, T. J. Grogan of the Department went to the building, could not gain access to it, and, on April 10, 1972, reported that the windows of the first floor had been "plywooded" but that the two upper floors appeared to be occupied. However, the Damage and Occupancy report (Form 2060B), prepared over the signature of the Director and of T. J. Grogan, and reviewed by R. Whitehouse, also dated April 10, 1972, reported the ground floor and second floors as vacant and the third floor as having an unknown occupant. On April 18, 1972, Jacksonville National Bank (mortgage servicer) requested permission to convey the property with one tenant in occupancy, and enclosed a document indicating that the first floor was decontrolled under local rent laws, that the second floor was a five-room apartment with a rental of $64.40 a month and the third floor, a four-room apartment with a rental of $44.15 a month. On April 25, 1972, the Director, answering the Bank, stated that the property was required to be conveyed vacant, and, the letter continued, "Inspection reveals that the proper-

ty is not livable due to severe lack of maintenance and inoperative systems causing health and sanitary conditions." A hand-written memorandum in the file indicates that on April 27, 1972, Mr. Walter Haner, then Realty Officer, took advantage of his being in Brooklyn for another purpose to examine the property at 2:15 in the afternoon, and noted that the first floor was boarded up and the front door locked, that he could not obtain an answer to his ringing of the three apartment bells, and that he waited around and saw no one enter or leave the building; his report concludes "which confirms the inspector's report of 4/10/72."

The "Request for Waiver, Hearing and Decision" on behalf of Jean Caramico and Nicholas Bula, dated April 20, had meanwhile reached the Federal Housing Administration on April 24, 1972. The attorneys for the plaintiffs in the present action had practically simultaneously submitted affirmations in opposition to the Secretary's possessory action in the Kings County Supreme Court.[1] And under date of April 27, 1972, the attorney for the Secretary in the possessory action sent these opposing affirmations to the Jacksonville Bank suggesting that they be sent on to the FHA in support of the Jacksonville Bank's "bid to get them to take the property tenanted." Mr. Haner, as Realty Officer, nevertheless on May 17, 1972, advised the plaintiff's attorney that, in response to the Request for Waiver, "The mortgagee" had posed the question of delivery of the property tenanted and that, "After a complete inspection of the building by our staff personnel, it was determined that the Secretary . . . would not accept the building with tenants in occupancy."

On June 7, counsel in the Secretary's possessory action sent to the Jacksonville Bank copies of the further papers opposing the action and requested reconsideration of the matter, or else, that the Secretary have the United States Attorney defend the motions, since they might set important precedents. Counsel on June 8, 1972, sent still further opposing papers along to the Jacksonville Bank, and it, in turn, drew them to the attention of Mr. Haner on June 19, 1972 with a request that he reconsider taking the property occupied. The Director answered the Bank on June 27, 1972, requiring compliance with the determination of April 25 to insist on vacant conveyance. The Director said that the servicing Bank's attorney could and should contact the general counsel in Washington, "who will inform him that the decision to evict is a just decision."

The Jacksonville Bank sent a report of violations on the building to Mr. Haner on July 20, 1972; it disclosed violations in failure to provide hot water at all, in hot water fixtures in the kitchen and bathroom on the third story, and in the failure to repair the leaky or defective water supply pipe in the bathtub on the third floor. Apparently, the last tenant, Ralph Caramico, was removed sometime after September 14, 1972, and the property seems to have been vacated and boarded up in October of 1972. Nevertheless, FHA General Counsel's office on November 3, 1972 advised the Jacksonville Bank, in confirmation of a telephone conversation, that the Washington Office had denied the tenant's application for Waiver of the Vacancy Requirement and that it was in order to take possessory action in order to convey the property vacant. The Bank was advised to communicate with General Counsel if a defense under the Uniform Relocation Act was interposed.

It does not appear that any substantial inspection of 90 Dikeman Street, was made before the determination to insist on vacant conveyance was arrived at. The file used in evidence does not show the subsequent history of the property or whether any repairs were made to it or whether it was offered for sale,

---

[1]. The action had already been commenced, apparently, when, on May 1, the Jacksonville Bank formally requested permission to institute a possessory action in the name of the Department, since the property was rent controlled.

or sold. No consideration was given by the Federal defendants to the interests of the occupants, the possibility that their tenancy might conserve the property, or to the reality of the theoretical possibility that the property could be expeditiously vacated, rehabilitated and resold advantageously.

The plaintiff, Maggie Evans, was an occupant of the property at 103 Pioneer Street in Brooklyn. The servicing bank was, again, the Jacksonville National Bank and the mortgagee FNMA. The mortgage was insured under Section 223(e), 12 U.S.C. § 1715n(e). The mortgagor was Walter Alston. Under date of August 4, 1971, the Department was given notice that there were ten past-due payments and that foreclosure had been started, which, on November 4, 1971, was reported to have been completed. The property was tenant occupied. Under date of March 30, 1972, plaintiff's attorney, on behalf of plaintiff Evans, requested a Waiver of the Vacant Delivery requirement, a Hearing and Decision, and, under date of April 13, 1972, plaintiff's attorney, at the request of the acting Associate Regional Counsel of HUD, formally requested FNMA to request permission for continued occupancy of the Pioneer Street property by the tenant. Meanwhile, plaintiff Evans had obtained a decision setting aside the service of process in the foreclosure action, and counsel in the foreclosure action on April 28, 1972, suggested that the Jacksonville Bank consult the FHA about vacant delivery, saying, "There is no doubt with a tenant in possession, the property would be preserved and not vandalized (you well know that my opinion for the past several years has been that receivership orders have been instituted in these actions in order to preserve the property in question and for no other reason)." On May 1, the Jacksonville Bank asked Mr. Walter Haner to advise whether the Secretary would accept the property occupied by the second floor tenant, plaintiff, Evans. The letter was received on May 5, and on May 9, 1972, two staff members inspected the property and reported that the first floor tenant, Evans, had been such for two years, that the rental was $150 per month and that it last been paid in February, 1972, to the mortgagor. The reported conditions was: "Plumbing fair. Boiler fair. Hot water heater broken. Maintenance fair-poor. Recommend dwelling be conveyed vacant." On May 12, 1972, the Director wrote the Jacksonville Bank that the property must be conveyed vacant and said that, "Inspection revealed that the property is not livable due to severe lack of maintenance and inoperative systems causing health and sanitary conditions." Permission to evict the tenant in the name of the Secretary was denied since the building was not a multiple dwelling. On May 17, plaintiff's attorney was advised by Mr. Walter Haner that "after a complete inspection of the building, by our staff personnel, it was determined that the Secretary . . . would not accept this building with tenants in occupancy."

In the Evans instance, as in that of Caramico, plaintiff's attorney had sought to appeal to the Secretary in Washington, and was advised by letter of June 20, 1972, applicable to both Caramico and to Evans, that it was the policy of the Department to require a mortgagee to convey foreclosed property vacant and unoccupied, that the Handbook provisions did not apply to cases where the Department "had determined after a complete inspection that required repair work, necessary before resale, dictates that the property be vacant," and that it was, therefore, the Department's determination that the property be required to be conveyed vacant in order that it might be renovated and resold.

It does not appear that anything more than a superficial examination was made of the property. No evidence supports the assertion that the property was not livable. The file material produced in evidence does not indicate that the property was renovated or repaired and offered for sale, or that such a course was in prospect when the vacant delivery was insisted upon. Such evidence as

there is supports the inference that the property was livable, that such inspection as was made confirmed that inference, and that there was no prospect of speedy resale.

The property at 318 Bond Street, Brooklyn, New York, occupied by the plaintiff Enrique and the intervenor, Concepcion, had been mortgaged by Braulo Concepcion (unrelated to the tenant) sometime before June 1, 1971, when the property went into default. FNMA was then the mortgagee. The mortgage was insured under Section 223 (e) of the National Housing Act. Foreclosure was commenced on December 14, 1971, when the unpaid principal amount of mortgage was $19,129.44, and the property was conveyed to the Secretary on February 29, 1972, with tenants Conception and Enrique in possession. T. J. Grogan of the Department went to the property on April 10, 1972, and could not gain access, but he reported that the vestibule door was locked, that the building appeared to be fully occupied, that there was no response to his knock or ringing of the doorbells and that from the names on the letter boxes he inferred that there were about sixteen tenants in the building. He described it as a four-story masonry building, surrounded by automobile junkyards. On April 18, the Director advised Jacksonville National Bank that no request had been made for conveyance occupied, that neither a certified rent roll nor a housing violation report had been sent in, and that permission had not been given to commence eviction proceedings in the Secretary's name. On April 25, 1972, Jacksonville Bank wrote the Realty Officer, Walter Haner, for permission to convey the property occupied, the tenants being named as "Enrique Rodriguez", "Nilsa Conafaion" and "Angla Gonzales". Apparently the names were inaccurately copied from doorbells. Two representatives of the Department went to the building in May and reported that there was a tenant, "Rios" on the first floor, that Concepcion, the former owner, was occupying the second floor, and that neither the Rios nor the Concepcion apartments could be entered; that the third floor was occupied by Enrique, had been so occupied for ten years at a rental of $50 per month, and that the rental had last been paid in February, 1972, to the owner Concepcion; and that the fourth floor was occupied by the tenant, Concepcion, had been so occupied for three years, that the rental was $86 a month, and that it was last paid in February, 1972, to the owner, Concepcion. The reporter stated that the fourth floor tenant was unrelated to the second floor tenant. As to the condition of the building, the report stated: "Plumbing & sewage good; boiler good; roof good. Maintenance fair. No access to 1st & 2nd fl. apts. Recommend conveyance of property occupied. Deflection in floors on 3rd & 4th floors. Row house." The "deflection" statement has written opposite it in a different hand, "What does this mean?" Underneath, in different ink, but in handwriting very like the reporter's, is written, "Recommend a determination be made as to the structural soundness of dwelling." On May 12, 1972 plaintiff's attorney sent the Request for Waiver, Hearing and Decision on the question of vacant possession to the Secretary, the Regional Administrator, the Hempstead Real Property Officer and the Regional Vice-president of FNMA. By the end of July, no possessory action had yet been instituted and FNMA's attention had been drawn to the present action, to the claim for relief under the Relocation Act and to the Request for Waiver and, under date of August 4–8, 1972, FNMA drew the Director's attention to the Request for Waiver of Vacant Delivery Requirement and formally joined in the request for necessary consideration in accordance with the Director's earlier instructions. At the request of Mr. Haner, the Department's regional engineer made an inspection of the property on August 9th with a representative of the architectural section and reported to the Director under date of August 11, 1972, that the rear masonry wall evinced set-

tlement and distortion of masonry arches over the windows on the fire escape side from the 1st through the 4th floors and excessive settlement of the wall above and below the middle windows on all floors; that the rear fire escapes required repairs. The interior cellar stairs were reported as broken and defective. The main wood girder was reported to be supported by unmilled wood posts and masonry piers and it was said that probably additional supporting members had been installed during the building's life to arrest further settlement of the girder. The cellar was reported to have low headroom and to be covered with dirt and debris. The plumbing, electrical and heating systems as viewed in the cellar were said to require extensive replacement or repair, and the outside cellar entrance was said to require replacement. Only the first floor apartment could be inspected; it was vacant and the floors were said to have "excessive slopes in several directions". The ceiling system was found approximately six inches out of level and all elements of the apartment dilapidated. The first floor stair hall rear, the ceiling, walls and floors were said to be deteriorated. The second floor framing members were reported as visible where there were missing sections of gypsum board and to be deteriorated. The entrances and windows to the second floor apartments were sealed with sheet metal, and the floor was evidently vacant. Dirt and debris were said to fill the rear yard and to result in retention of storm water and infestation. The one-story garage adjoining the property was said to be deteriorated. Brass founders (a junkyard) and auto wrecking businesses were across the street. The area was described to be primarily commercial and light industry. The conclusion and recommendations were, "This property shows signs of advanced deterioration and structural failures. It is, therefore, not considered acceptable from an engineering aspect." On August 7, 1972, the Jacksonville Bank reiterated the request to convey the property tenant occupied

and enclosed a rent roll and a violation report, which called for properly fire-retarding the cellar ceiling, walls and the ceiling storage area in the first story in the public hall at the east; for the removal of all obstructions and the repair of all defects in the bathtub on the first story apartment; for the removal of the accumulations of rubbish and the maintenance of a clean condition in the basement extension at the rear and throughout it; and for proper repair of the unhinged entrance door. The violations were based on inspection reports of October and December 1970 and March of 1971. The authorized maximum rents for the property were apparently $75 a month for the first and third floors and $30.08 for the top floor. On September 19, 1972 the Director advised Jacksonville Bank that the property would have to be conveyed vacant, that "Inspection reveals that the property is not livable due to advanced deterioration and structural failure." Photographs of the property are in the exhibit (Exhibit D). One is dated 4–10–72, others are undated but possibly were taken as late as September of 1972. Since they are of the facade of the building only, very little can be inferred from them, but the overall appearance of the building is not so unprepossessing as a reading of the report of the regional civil engineer would lead one to expect. Nor does the report of violations suggest structural unsoundness. The evidence does not indicate what happened to the property. Apparently, it was vacated.

There is no suggestion that any tenant was informed of and given an opportunity to support the recommendation of the staff members who made the May inspection, or to meet the regional civil engineer's August strictures on the property.

Intervenor Juanita Anderson was a tenant in the property at 280 Carlton Avenue, Brooklyn. The mortgagor of that property was Oleda M. James and the mortgage was apparently made some time in advance of August 1, 1969. The mortgagee was FNMA. The mortgage

was insured under Section 223(e) of the National Housing Act. The last mortgage payment was made in November of 1969, and foreclosure was instituted on August 11, 1970, at which time $21,833.-63 of principal was due on the mortgage. The building was a four story building and completely occupied when the foreclosure was reported as completed by Eastern Service Corporation in a letter received by FHA on April 1, 1971. The tenants were Anderson, Politano, Conyles and Johnson. The rentals being received varied between $60 and $74 and were paid in each instance by the Welfare Department. Eastern Service Corporation asked to be advised whether the property should be conveyed vacant or occupied. A handwritten report dated April 8, 1971 to the Realty Officer by one of the staff members reported that access was gained only to the first floor apartment, and there is no statement with respect to condition in the report. On April 13 Eastern Service was advised that the premises could not be inspected and was asked to arrange to have the premises made accessible. On April 23, 1971 Courtney from the Hempstead office made an inspection and reported to the Realty Officer that it was a four story brick row building in a poor location with four apartments, all occupied; that the roof and plumbing leaked; that the boiler was defunct and there was neither heat nor hot water; and that the general condition was poor. He recommended that the property be accepted vacant. On May 3, 1971, the Assistant State Director wrote Eastern Service requiring vacant delivery, saying that, "Inspection reveals that the property is not livable due to severe lack of maintenance and inoperative systems causing health and sanitary conditions." As late as February 8, 1973, the vacant possession had not been secured and the Department was threatening to recommend a reconveyance to the mortgagee for failure to effect vacant delivery.

Intervenors Dorothy Brown and Wilma Love are occupants of premises at 1652 St. John Place, Brooklyn. The mortgagor of the property was James E. Solomon, the mortgagee was FNMA, and the mortgage was made apparently shortly before September, 1969, and, it seems, was insured under Section 203 of the National Housing Act. The last completely paid installment was that due December 1, 1969, and the property was put into foreclosure on April 15, 1970 at which time the principal amount due was $18,942.46. The property had been fire damaged apparently some time in September 1970, the fire damage apparently principally affecting the first floor. A fire insurance adjustment of $2,500 was made in respect of the loss. The property was conveyed to the Secretary on November 1, 1971, at which time the tenants Brown and Love were in possession and were reported to have paid their rents of $85 a month through March of 1969. It appears that both had been tenants since January of 1969. An estimate of required repairs of the property was made in December 1971, and at that time the property was described as having an "as is" value of $1,000, and as requiring repairs of $16,200 and having an estimated replacement cost of $22,207. Its market value is given as $22,000 on the basis of comparison with properties on Grand Street and St. Marks Avenue. The property presented the question of conveyance vacant or occupied, and damaged or repaired, and by letters of June 18 and August 13, 1971, the property was required to be conveyed vacant and was permitted to be conveyed in damaged condition. While it was anticipated in mid- and early 1972 that the tenants would be evicted, since a final order of eviction was reportedly obtained on February 7, 1972, on May 4, 1972, plaintiff's attorney interposed a Request for Waiver, Hearing and Decision on the issue of vacant possession. At least on February 28, 1973 intervenor Dorothy Brown was still in possession.

Intervenor Joseph Pavia is one of three tenants in the premises at 2833 West 27th Street in Brooklyn. The mortgage is again a mortgage insured

under Section 223(e) of the National Housing Act, 12 U.S.C. § 1715n(e). The mortgagor was Keith Goss, the mortgagee FNMA. The first notice of default was sent under date of January 7, 1971 with the notation that foreclosure was imminent and a further notice of March 19, 1971 advised that foreclosure had been started. A third notice to the Department advised that the foreclosure was complete, that the sale had been held on February 8, 1972, and that the tenants were in occupancy at the time of sale. The Department was asked under date of March 16, 1972 to consider eviction in the name of HUD and to advise the servicing corporation. The violations search apparently furnished to the Department under date of May 19, 1972 disclosed no violations against the property. Meanwhile, on March 24, 1972, D. G. Herschler had inspected the property and reported to the Realty Officer that there were three tenants in the property: Ham, on the first floor had been there for two months, was paying rent at the rate of $225, and had paid through March of 1972 to someone identified simply as "Halsem"; Ford, on the second floor, had been a tenant for two years, paying a rent of $125, was paid up to March 1972; and the intervenor Pavia in the basement who had been in occupation for four years, was paying rent of $66.-50 and had paid through March of 1972. As to the condition of the property and the inspector's recommendation, the report reads: "Heating, electrical, plumbing, sewage all good. Recommend property be conveyed vacant." The report described the dwelling as a two story brick row house on a "fair/good" street. By letter of June 13, 1972, the Director advised that the property would have to be conveyed vacant. Under date of September 21, 1972, the servicing organization sent to the Department a copy of the New York City Department of Rent and Housing Maintenance Office of Rent Control report of the controlled rent; it advised that the basement rent was $60.14 a month, the top floor $78.84

a month and that there was no registered rental for the first floor. The servicing corporation requested a decision as to whether or not the property could be conveyed in its present state. On September 25, 1972 the director advised the servicing corporation, in response, to refer back to the letter of June 13, 1972 for the Department's decision in the matter. Thereafter, under date of January 18, 1973 plaintiff's attorneys sent a Request for Waiver of the vacant delivery requirement and for a Hearing and Decision, addressing it to the Insuring Officer at Hempstead, to the Secretary, and to the Regional Vice-president of FNMA. The Request for Waiver was not acted upon.

The intervenors Clara Turner and Eular Reed are tenants of premises at 308 Greene Avenue, Brooklyn. The mortgagors were Luis and Maria Quiles, the mortgagee, FNMA, and the mortgage was insured under Section 221(d)(2) of the National Housing Act, 12 U.S.C. § 1715$l$(d)(2). Under date of June 10, 1970, the servicing corporation advised the Department that foreclosure of the property was imminent, and on November 13th reiterated that notification stating that at that date there were four past due payments. Under date of August 15, 1972, the servicing company advised that foreclosure had been started. The mortgage was apparently created shortly before February 1970, and when foreclosure proceedings were commenced, apparently on November 13, 1970, the principal amount due on the mortgage was $23,093.95. Title was conveyed to the Secretary on September 12, 1972, and at that time, the service corporation reported that the first and second floors were vacant and that Clara Turner occupied the third floor. Shortly after the conveyance, the Department was advised that the maximum base rents for the third and fourth floor apartments were respectively $55.70 and $58.70 a month, that the basement was $34.50 a month and the "parlor floor" $43.40 a month. When foreclosure was being completed, there were a number of

liens against the property, including a Department of Health mechanic's lien and two emergency repair liens aggregating over $3,800. On October 24, 1972, F. X. Sweeney inspected the property and reported to the Realty Officer "Subject dwelling partially occupied by two tenants; recommend acquisition of property after removal of tenants." On February 8, 1973 the Acting Director inquired whether the tenants had been removed. By formal notice of October 27, 1972, the servicing corporation was instructed to remove the tenants; the tenants were said to be Turner and Reed, each tenant paying $100 a month rent (although the earlier Form 1025 gave the rental of Reed as $58.00). On January 11, 1973, plaintiff's attorney sent on behalf of the tenant Reed a Request for Waiver, Hearing and Decision on the vacant possession question to the Real Property Officer of the Hempstead Insurance Office, the Secretary and the Regional Vice-president of FNMA. On February 8, 1973, the acting Director of the Department inquired of the servicing corporation by letter what action had been taken to remove the occupants. Under date of February 13, 1973, plaintiff's attorney on behalf of the occupant Clara Turner sent a second Request for Waiver of vacant delivery and for a Hearing and Decision to the Real Property officer of the Hempstead Insuring Office, the Secretary and the loan representative of FNMA. On February 28, 1973, the two tenants, both of whom are intervenors, Eular Reed and Clara Turner, were still occupying the premises. The tenant Reed had been such for 28 years and the tenant Turner had been such for three years.

■ The facts leave no room for doubt that the Federal defendants have failed to give effect to the provisions of paragraph 91 of chapter 4 of the Property Disposition Handbook (RHM 4310.-5), and that the decisions made with respect to whether property is to be conveyed vacant or may be conveyed occupied evince no pattern of consistent conduct or consistent application of articulate principle. For the reasons set forth in the previous decisions in the present case and in Manners v. Secretary, it must be concluded that the interests of occupancy of the plaintiffs and intervenors have been terminated without adequate compliance with minimal due process standards and that the continued occupancies of those plaintiffs and intervenors not yet dispossessed are imminently threatened with the continuance of treatment of the same governmentally inadequate and unacceptably arbitrary kind. It does not appear that granting the temporary injunction sought will impose the slightest hardship or disadvantage on the defendant Department. The record shows no evidence of a publicly advantageous use of its insistences upon vacant deliveries of foreclosed properties, whereas the disadvantage and affirmative, unavoidable cost and damage to the occupants is manifest and without other remedy.

It is accordingly

Ordered that the Secretary of the Department of Housing and Urban Development, the Commissioner of the Federal Housing Administration, the Regional Administrator for Region II of the Department of Housing and Urban Development, and the Realty Officer, Federal Housing Administration, Hempstead, New York, Insuring Office, are enjoined until the final determination of this action from taking any action directly or indirectly to require Federal National Mortgage Association or to authorize Federal National Mortgage Association in the name of the Department of Housing and Urban Development or any of its officers to require the removal of tenants from foreclosed properties, the mortgages on which the Secretary has insured as a condition to the payment of the insurance claims unless one of the two following courses has first been followed.

A. The Secretary has adopted, after compliance with rulemaking procedures as set forth in 5 U.S.C. § 553, rules respecting waiver of and insistence upon the general vacant delivery requirement,

24 C.F.R. § 203.381, which at minimum provide for notification to occupants of premises that have been or are being foreclosed and are to be or have been conveyed to the Secretary that the Secretary desires to terminate their occupation of the premises, advises them in succinct form of the grounds on which the determination to terminate occupation has been made, and affords the tenant an opportunity to submit and to support with evidence the considerations, if any, that the occupant wishes the Secretary to take into account before reaching a determination and which require an explicit decision by the Secretary of any issue framed by the statement of his grounds for termination and the statement of opposing considerations that adequately disposes of the issue; or

B. Application is made in the present action, on notice to the plaintiff or intervenor and the attorney for the plaintiffs and intervenors, of the Secretary's intention to require vacant delivery and the basis for the formation of that intention and requests the dissolution of the present injunction insofar as it affects the property in question.