**CLASSIC DISTRIBUTORS, INC.**

v.

**Leroy S. ZIMMERMAN, Individually and in his official capacity as District Attorney of Dauphin County, Pennsylvania, et al.**

**Civ. No. 74-340.**

United States District Court,
M. D. Pennsylvania.

Oct. 18, 1974.

**830**

Richard Friedman, Harrisburg, Pa., Burton W. Sandler, Towson, Md., for plaintiff.

James K. Thomas, Harrisburg, Pa., for defendants.

Before ROSENN, Circuit Judge, SHERIDAN, Chief District Judge, and NEALON, District Judge.

## MEMORANDUM

NEALON, District Judge.

Plaintiff, Classic Distributors, Inc., the owner of an adult bookstore in Harrisburg, Dauphin County, Pennsylvania, filed this action challenging the constitutionality, under the First and Fourteenth Amendments, of a portion of Pennsylvania's obscenity statute, 18 C. P.S.A. § 5903(h).[1] Specifically, plain-

---

1. 18 C.P.S.A. § 5903(h) reads as follows:

"(h) Injunction.—The district attorney of any county in which any person sells, lends, distributes, exhibits, gives away or shows, or is about to sell, lend, distribute, exhibit, give away or show, or has in his possession with intent to sell, resell, lend, distribute, exhibit, give away or show, any obscene literature, book, magazine, pamphlet, newspaper, storypaper, paper, comic book, writing, drawing, photograph, figure or image, or any written or printed matter of an obscene nature, or any article or instrument of an obscene nature, may institute proceedings in equity in the court of common pleas of said county for the purpose of enjoining the sale, resale, lending, distribution, exhibit, gift or show of such obscene literature, book, magazine, pamphlet, newspaper, storypaper, paper, comic book, writing, drawing, photograph, figure or image, or any written or printed

tiff seeks to (1) restrain and enjoin the defendants, a Dauphin County Common Pleas Court Judge, the Dauphin County District Attorney and a Dauphin County Deputy District Attorney, from closing plaintiff's place of business; (2) obtain a declaration that the Pennsylvania obscenity statute is unconstitutional on its face and as applied to the plaintiff; and (3) recover damages of $50,000. The defendants have moved to dismiss on the grounds that (1) they were immune from suit; (2) this court should not interfere with pending state proceedings; and (3) this court should abstain inasmuch as the applicable state statute has not been authoritatively construed by the Pennsylvania courts.

The action was properly brought under the Civil Rights Act, 42 U.S.C.A. Section 1983, the Declaratory Judgment Act, 28 U.S.C.A. Sections 2201, 2202, and the First and Fourteenth Amendments. Federal jurisdiction is predicated on 28 U.S.C.A. Sections 1331 and 1343. Since plaintiff seeks injunctive relief restraining state officials from the enforcement, operation and execution of a state statute on the ground of its unconstitutionality, a three-judge court was convened pursuant to 28 U.S.C.A. Section 2281. And in accordance with Rule 65(a)(2) of the Federal Rules of Civil Procedure, the trial of this action on its merits was ordered to be advanced and consolidated with the hearing for a preliminary injunction, and a final hearing was held on June 14, 1974.

I.

The factual background of this case is complex and must be discussed in some detail before addressing the legal issues involved. That background centers around a controversy that existed among certain operators of adult bookstores in Pennsylvania, and a series of violent acts spawned by the controversy. The key figures in the dispute were Allen G. Morrow, the principal of plaintiff corporation, John Krasner, and Frank M. Beaver. Morrow operated adult bookstores in Collegeville, Montgomery County; Cresson, Cambria County; Hanover Township, Lehigh County; and the store in question here, located at 3920 Jonestown Road, Harrisburg, which is in Dauphin County. Krasner operated stores in Hanover Township, Lehigh County; Reed Township in Dauphin County; and was a partner with Beaver in a second store in Dauphin County lo-

---

matter of an obscene nature, or any article or instrument of an obscene nature, contrary to the provisions of this section, and for such purposes jurisdiction is hereby conferred upon said courts. A preliminary injunction may issue and a hearing thereafter be held thereon in conformity with the Rules of Civil Procedure upon the averment of the district attorney that the sale, resale, lending, distribution, exhibit, gift or show of such publication constitutes a danger to the welfare or peace of the community. The district attorney shall not be required to give bond."

Title 18 is Pennsylvania's Code of Crimes and Offenses. The relevant Rule of Civil Procedure is Rule 1531(d) and (f), 12 P.S. Appendix:

\* \* \*

"(d) An injunction granted without notice to the defendant shall be deemed dissolved unless a hearing on the continuance of the injunction is held within five (5) days after the granting of the injunction or within such other time as the parties may agree or as the court upon cause shown shall direct."

\* \* \*

"(f)(1) When a preliminary or special injunction involving freedom of expression is issued, either without notice or after notice and hearing, the court shall hold a final hearing within three (3) days after demand by the defendant. A final decree shall be filed in the office of the prothonotary within twenty-four (24) hours after the close of the hearing. If the final hearing is not held within the three (3) day period, or if the final decree is not filed within twenty-four (24) hours after the close of the hearing, the injunction shall be deemed dissolved.

"(2) When the defendant demands such a final hearing, no further pleadings shall be required and Rules 1517, 1518 and 1519(a) and (b) as to adjudication, decree nisi and exceptions thereto shall not apply.

"(3) The trial judge shall file a written memorandum supporting the final decree within five (5) days after it is filed."

cated at 315 Market Street, Harrisburg. Beaver also operated a store in Highspire, Dauphin County.[2]

The Commonwealth of Pennsylvania's first contact with any of these key figures was an investigation by the Dauphin County District Attorney's office of the store located at 315 Market Street in Harrisburg. That investigation led to the June, 1973 arrest of Beaver and Krasner on the charge of selling obscene materials, and also broadened, after June, 1973, into an investigation of other adult bookstores in Dauphin County. Through that investigation, the District Attorney's office learned, prior to April 20, 1974, that Krasner had another store in Reed Township, Beaver another one in Highspire, and Morrow the store at 3920 Jonestown Road in Harrisburg—all within Dauphin County. Although the dispute among these three figures had begun prior to April 20, 1974, and had resulted in several violent actions or attempted violent actions which were known to the general public prior to that date,[3] the District Attorney's office had not, prior to April 20, 1974, connected the three key figures with any of these actions, nor had that office concluded prior to that date that a dispute existed among those figures.

On April 20, 1974, Dauphin County Deputy District Attorney Richard L. Guida, a defendant in this case, learned that William Alfree, an agent of the United States Treasury, Bureau of Alcohol, Tobacco and Firearms, had been engaged in an undercover investigation of Beaver; had been solicited by Beaver to help blow up Morrow's store in Collegeville; and was planning to accompany Beaver on that mission that very night, April 20, 1974. On that occasion, Guida joined the Pennsylvania State Police in a stakeout of Beaver's store in Highspire. He observed Beaver and Alfree leave that store in Beaver's car, and was with the police when they apprehended Beaver and Alfree in Dauphin County at an entrance to the Pennsylvania Turnpike. Guida was also present when the police searched Beaver's car pursuant to a search warrant and discovered 85 pounds of dynamite, six blasting caps, a two-minute timer, a six-volt battery, a length of wire, and other items that fit the plan to destroy the Collegeville store that had been described to Alfree by Beaver.

That night, after Beaver had been arrested, Guida spoke with Alfree at some length, and through Alfree learned of a chain of events that indicated to him that a state of war existed among Beaver, Krasner and Morrow. He learned that Krasner had instructed Beaver to blow up the Collegeville store; that Beaver had detonated the explosion that demolished Morrow's Cresson store on January 22, 1974; that Beaver had planned to murder two people the next night, April 21, 1974, an Ann Hogencamp and a Dennis Scott (Scott being a man whom Beaver suspected of planning to rob Krasner, who was Beaver's associate, and Hogencamp being an ex-girlfriend of Beaver and an associate of Scott) ; and that Beaver had offered Alfree a sum of money to help him murder one Bobby Pine, who was a Philadelphia employee of Morrow. Alfree also informed Guida that Krasner had been arrested and indicted for soliciting the murder of Morrow, a fact which Guida had known prior to April 20, 1974, having learned of it through the news media.

Guida discussed these facts with his superior, Dauphin County District Attorney Leroy S. Zimmerman, also a de-

2. There may be other stores in Pennsylvania, but they did not figure in the testimony in this case.

3. An adult bookstore in Hanover Township had been destroyed by arson on December 18, 1972; one in Hanover Township was demolished by an explosive device on April 28, 1973; and one in Cresson was blown up on January 22, 1974. Pennsylvania State Police investigations had established that these buildings were intentionally destroyed, but had not determined who the responsible parties were. Another fact which was known to the general public prior to April 20, 1974 was that Krasner had been arrested and indicted in Luzerne County, Pennsylvania, for soliciting the murder of Morrow.

fendant in this case, and they both concluded that, because each of the figures involved in what was apparently a very vicious dispute owned at least one bookstore in Dauphin County, there was a threat to the welfare. of the Dauphin County community. Zimmerman dispatched a detective to make purchases from each of the four stores located in Dauphin County, and, armed with the purchased materials [4] and their knowledge of the dispute that existed among Krasner, Beaver and Morrow, Zimmerman and Guida on April 24th appeared in the Dauphin County Court of Common Pleas before the Honorable Judge Richard B. Wickersham, also a defendant in this case, in an *ex parte* hearing pursuant to a complaint seeking to enjoin, under the Pennsylvania obscenity statute, the operation of the four Dauphin County stores operated by the three disputants. At that hearing, Zimmerman and Guida displayed the purchased materials to Judge Wickersham, and related what they knew of the dispute among Krasner, Beaver and Morrow. Specifically, they told the judge of the murder plots that had been disclosed to Agent Alfree, the demolishment of the Cresson store, and the arrest of Beaver in Dauphin County with a large quantity of dynamite when he was en route to blow up the Collegeville store.[5] In addition, they pointed out to the judge that the four stores whose operation they sought to enjoin were located in Dauphin County and were owned by the three disputants. At the conclusion of the hearing, Judge Wickersham entered a preliminary injunction without notice to the store operators, and, pursuant· to Rule 1531(d) of the Pennsylvania Rules of Civil Procedure, scheduled a hearing on the continuance of the injunction for April 29, 1974.[6]

At the time set for that hearing, Burton W. Sandler, counsel for Classic, one of the defendants in that case, met Guida at the Dauphin County Courthouse and informed him that he had just filed a petition for removal, pursuant to 28 U.S.C. § 1443, in the U. S. District Court for the Middle District of Pennsylvania, located in Harrisburg. He also informed Guida that the removal had been effected pursuant to 28 U.S.C. § 1446(e) and that, therefore, the state court could proceed no further with the matter. At the hearing before this court, Guida stated that he had been uncertain about the jurisdictional question posed by 28 U.S.C. § 1446(e). "I was

4. Those materials included several magazines containing allegedly obscene photographs; four allegedly obscene eight-millimeter films; a vaginal bag; a vibrator, three prophylactics; and an artificial penis.

5. Guida and Fire Marshal George F. Umberger of the Pennsylvania State Police testified at the hearing before this court about other aspects of the dispute that came to their attention, after the hearings before Judge Wickersham, in a manner that evidenced the state of war among Krasner, Beaver and Morrow. Specifically, these additional facts were that in July, 1973, Morrow solicited the murder of Krasner; that Krasner operated the bookstore in Hanover Township that had been burned down on December 18, 1972; and that Morrow operated the Hanover Township store demolished on April 28, 1973. See footnote 3, *supra*. While these facts were not specifically known to the defendants prior to the issuance of the injunction at issue here, and thus are not relevant to the state of mind of the defendants at the time the injunction was sought and issued, they are further evidence of the general atmosphere in central and eastern Pennsylvania that formed the background to the issuance of the injunction.

6. A letter, appended to the court order entering the April 24, 1974 preliminary injunction, and written on the stationary of the Office of the District Attorney of Dauphin County, informed those persons upon whom the order was served that "(t)his is a *civil action* and you are *not* under arrest." The letter also contained a warning that anyone violating the order could be held in contempt of court. At the hearing, held before this court, Deputy District Attorney Guida explained:

"I wanted the individuals, the laymen in the stores to know that they weren't under criminal arrest at that time. That letter was not for the defendants, per se, but was for the operator of the store at that time. I would consider it a criminal prosecution because we were operating under a criminal statute."

Notes of Testimony, at 98.

unaware that a federal . . . court could take jurisdiction without a court order." Notes of testimony at 72.

Guida suggested that Sandler explain the removal issue to Judge Wickersham and the parties then entered Judge Wickersham's chambers at which time Attorney Sandler handed Judge Wickersham a copy of the petition for removal and a memorandum of law explaining that once a petition for removal is filed, the state court is automatically ousted of jurisdiction and can proceed no further. After some discussion, the parties entered the courtroom at which time Attorney Sandler formally objected to the jurisdiction of the state court. Judge Wickersham ruled that "unless and until I have a restraining order from the Federal District Bench, we shall continue."[7] At that, Attorney Sandler absented himself from the courtroom. Upon completion of the hearing, during which, in addition to testimony from Zimmerman and three detectives from the Dauphin County District Attorney's office, there was testimony from Agent Alfree concerning both the plot to blow up the Collegeville store and the other escapades which Beaver had disclosed to Alfree, Judge Wickersham ordered that the pre-liminary injunction entered on April 24, 1974 be continued in effect, pending a final hearing on the matter, which he set for May 31, 1974.[8]

On May 2, 1974, Classic filed the present action, and on May 28, 1974, testimony was taken before Judge Nealon, sitting alone as a District Judge, on Classic's application, pursuant to Rule 65, Federal Rules of Civil Procedure, for a temporary restraining order. On the same date, that is, May 28, Judge R. Dixon Herman of the Middle District of Pennsylvania granted a motion to remand the action to the Dauphin County Court of Common Pleas from which it had been removed on April 29, 1974. Judge Nealon denied Classic's application for a temporary restraining order on May 29, and on the same day, Judge Wickersham continued indefinitely the final hearing on the District Attorney's request for a permanent injunction, which had been set for May 31, 1974, thereby leaving in effect the preliminary injunction which had been granted on April 24, 1974.[9] At no point during the state court proceedings, it should be noted, did Classic request a final hearing pursuant to Rule 1531(f)(1), Pennsylvania Rules of Civil Procedure.

---

7. Notes of Testimony taken in the proceeding for a preliminary injunction before Judge Wickersham, at 6. Had the April 29 hearing not been held, the *ex parte* injunction would have automatically dissolved, under Rule 1531(d), Pa.R.Civ.P.

8. At the completion of the April 29 hearing, Judge Wickersham ruled as follows:

"Finally, in view of the testimony of the Federal Officers and the Complaint of District Attorney Zimmerman, I find in addition that there is indeed a danger to the welfare and peace of the community and the citizens of Dauphin County in what obviously is an impending conflict or dispute or war of the most serious dimensions between owners and operators of these various adult bookstores . . . I further am going to direct, Mr. Guida,— Provisions of Rule 1531 not being completely clear, I am going to direct that a final hearing be held on Friday, May 31, 1974, at 10:00 o'clock A.M. in this Courtroom, unless the Defendants request an earlier or different time for the hearing, and we will take such request under advisement when and if made."
Notes of testimony of the April 29, 1974 hearing before Judge Wickersham at 39.

9. Between April 29 and May 29, Krasner and Beaver, two of the principals involved in the violent dispute which had been an important factor in Judge Wickersham's issuance of a preliminary injunction on April 24 and his continuance of that injunction on April 29, and who were also two of the parties in the equity action pending in Judge Wickersham's court, were convicted for selling obscene materials in Dauphin County. They received prison sentences and were committed to jail in lieu of bail. On May 28, Guida learned that Krasner was slated for trial in Luzerne County on a charge of solicitation to murder and that Krasner had been transferred to Luzerne County. Guida informed this Court that Judge Wickersham continued the hearing on the permanent injunction "until Mr. Krasner could appear." Notes of Testimony at 73.

## II.

 Plaintiff's claim for damages can be disposed of summarily. The doctrine of judicial immunity protects judges from liability for damages for acts committed within their judicial jurisdiction, and it is settled that such immunity applies to suits brought under the Civil Rights Act, 42 U.S.C.A. Section 1983. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The only exception to such immunity is acts of a judge while hearing a case where "there is clearly no jurisdiction over the subject matter," as distinguished from acts which "are in excess of . . . [his] jurisdiction [.]" Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351–352, 20 L.Ed. 646 (1871).[10] The exception refers to cases over which it would be inherently impossible for a court to take jurisdiction, as, for example, a probate court with authority only over wills and the settlement of estates purporting to take jurisdiction of a criminal case. Id. at 352. As Judge Wickersham was at all times at issue here acting in the context of a case over which he was given express jurisdiction by the Pennsylvania obscenity statute, see 18 C.P.S.A. Section 5903(h), it is clear that he was at all such times acting within his judicial jurisdiction. Even his retention of jurisdiction after the case had been removed, in apparent contravention of 28 U.S.C.A. 1446(e), was at worst an act in excess of his jurisdiction; the removal did not alter the fact that the subject matter of the case was initially within the jurisdiction of the state court. Accordingly, plaintiff's claim for damages against Judge Wickersham must be dismissed.[11]

 The damage claim against the District Attorney and the Deputy District Attorney must also be dismissed. Prosecuting attorneys enjoy the same immunity afforded members of the judiciary. Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1966). A "state prosecuting attorney is immune from liability under the Civil Rights Act, unless his alleged actions are clearly outside the scope of his jurisdiction." Kauffman v. Moss, 420 F. 2d 1270, 1272 (3d Cir. 1970). As the District Attorney and Deputy District Attorney were acting in a manner expressly provided for by the Pennsylvania obscenity statute when they initiated and litigated the injunctive proceedings in the state court, they were clearly acting within the scope of their jurisdiction and cannot be held liable to plaintiff in damages.

## III.

 With respect to plaintiff's claim for injunctive and declaratory relief, we recognize at the outset that since plaintiff seeks relief under the Civil Rights Act, 42 U.S.C.A. Section 1983, this Court is not absolutely without power to enjoin the state court proceedings, as suits under the Civil Rights Act fall within one of the recognized exceptions to the Anti-Injunction Statute, 28 U.S. C.A. Section 2283. Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). Nevertheless, we must consider whether the doctrine elaborated in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) requires us to stay our hand in this case and dismiss plaintiff's claims for equitable relief. See Mitchum v. Foster, supra, 407 U.S. at 243, 92 S.Ct. 2151. *Younger* provided

---

10. The Bradley v. Fisher elaboration of the doctrine of judicial immunity has been reaffirmed by the Supreme Court as recently as 1967 in Pierson v. Ray, 386 U.S. 547, 553, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). See also Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1966).

11. Defendant Judge Wickersham argues that he is also immune from injunctive or declaratory relief, citing Smallwood v. United States, 358 F.Supp. 398 (E.D.Mo.) aff'd, 8 Cir., 486 F.2d 1407 (1973), and Robinson v. McCorkle, 462 F.2d 111 (3d Cir. 1972). That proposition is certainly debatable. See, e. g., Conover v. Montemuro, 477 F.2d 1073 (3d Cir. 1973). In any event, in view of the manner in which we have disposed of plaintiff's claims for injunctive and declaratory relief, see Part III, *infra*, we need not decide this question.

that federal courts may not stay or enjoin pending state criminal proceedings except under special circumstances. Its principle also applies to cases in which declaratory relief is sought. Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L. Ed.2d 688 (1971). As the Court in *Younger* stated, "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." Younger v. Harris, supra, 401 U.S. at 45, 91 S.Ct. at 751. Plaintiff argues that the *Younger* doctrine does not mandate dismissal here, because (1) the *Younger* doctrine does not even apply to this case, as the pending state action with which we are asked to interfere is a civil proceeding, and *Younger* only applies to interference with pending criminal proceedings; and (2) in any event the facts of this case present the "special circumstances" which require a federal court to dispense with the general rule of non-interference.[12] A discussion of plaintiff's arguments follows.

▆▆▆▆ Plaintiff's first contention presents a question that was not answered by the majority opinion in Younger v. Harris, supra, and was expressly left open by Justice Stewart's concurring opinion in that case, in which he stated, "we do not deal with the considerations that should govern a federal court when it is asked to intervene in state civil proceedings, where, for various reasons, the balance might be struck differently." Id., at 55, 91 S.Ct., at 757. Nevertheless, even though we may not have the benefit of an express Supreme Court holding, which we would have were we being asked here to enjoin a pending state criminal prosecution,[13] we must agree with Justice Rehnquist that "[w]hile the test to be applied may be less stringent in civil cases than in criminal, . . . [it is] clear that the federal courts will not casually enjoin the conduct of pending state court proceedings of either type." Cousins v. Wigoda, 409 U.S. 1201, 1206, 92 S.Ct. 2610, 2614, 34 L.Ed.2d 15 (1972) (Justice Rehnquist, in his role as Circuit Justice for the Seventh Circuit Court of Appeals, denying an application for a stay of an order entered by the Seventh Circuit Court of Appeals vacating an injunction entered by the district court against a pending civil proceeding.) The same principles of federalism that

---

12. Plaintiff also argues that the *Younger* doctrine does not apply to a claim for money damages under the Civil Rights Act, 42 U. S.C.A. § 1983, and that, accordingly, we must at least retain jurisdiction of the claim for damages. As we have already disposed of plaintiff's claim for damages, there is no need to address this argument.

13. It is questionable whether we are in fact confronted with a state civil proceeding in this case. On the one hand, the portion of the Pennsylvania obscenity statute that is challenged here subjects prospective defendants to no risk of fine or imprisonment; the worst that can happen to a party enjoined under the statute is the economic loss incurred by an inability to sell the materials subject to the injunction. Thus, in the sense that the statute provides for no express "penalty," it is civil in nature. On the other hand, the obscenity statute is part of Pennsylvania's Code of Crimes and Offenses. Furthermore, the statute establishes a proceeding in which the Commonwealth will be a party. And while it may not provide for a traditional criminal penalty in the form of a

fine or imprisonment, the statute does provide for drastic relief in the form of an injunction of the sale or display of literature, photographs or other objects found to be obscene within the meaning of the Statute. The statute may very well be criminal. In any event, it is not the type of civil statute Justice Stewart had in mind when he stated, while concurring in Younger v. Harris: "Courts of equity have traditionally shown greater reluctance to intervene in criminal prosecutions than in civil cases . . . The offense to state interests is likely to be less in a civil proceeding. A State's decision to classify conduct as criminal provides some indication of the importance it has ascribed to prompt and unencumbered enforcement of its law. By contrast, the State might not even be a party in a proceeding under a civil statute." Younger v. Harris, 401 U.S. 37, 55, n. 2, 91 S.Ct. 746, 757, 27 L.Ed.2d 669 (1970).

Nevertheless, as the parties have all presumed that the state proceeding at issue here is civil, see, e. g., n. 6 supra, we will assume for the sake of discussion that we are dealing with a civil proceeding.

underlay the holding in *Younger* and prompted the Court in that case to state that "[w]hat the concept [of "Our Federalism"] does represent is a system . . . in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States [,]" Younger v. Harris, supra, 401 U.S. at 44, 91 S.Ct. at 750, caution us against applying the *Younger* doctrine according to any formalistic distinction between criminal and civil cases. In short, we agree with the court in Palaio v. McAuliffe, 466 F.2d 1230, 1232–1233 (5th Cir. 1972) that "application of the principles of *Younger* should not depend upon such labels as 'civil' or 'criminal,' but rather should be governed by analysis of the competing interests that each case presents." [14]

■ Turning to the competing interests involved here, we note immediately that the facts present a case in which the Commonwealth's interest in the "prompt and unencumbered enforcement of its law" is paramount. Younger v. Harris, 401 U.S. 37, 55, 91 S.Ct. 746, 757, 27 L.Ed.2d 669, n. 2 (*concurring* opinion of Justice Stewart). The state court action was commenced by state governmental officials charged by law with the duty of enforcing the state's criminal laws. At the time they moved for injunctive relief, those officials knew of facts which gave them reasonable grounds to believe that the compet-

ing owners of four bookstores in Dauphin County were engaged in a war of rivalry that threatened the lives and property of Dauphin County citizens. It is, of course, true that no bombings, arsons or murders occurred within the boundaries of Dauphin County. On the other hand, the plans to blow up the Collegeville store were formulated at the Highspire store in Dauphin County, and the 85 pounds of explosives to be used for the job were transported through that county. Two plots to commit murder were also formed in Dauphin County. Given the bizarre state of mind of the combatants, and the fact that they owned four bookstores in Dauphin County, it was more than reasonable for the prosecutors to conclude that it was only a matter of time before the fighting and violence spilled over into Dauphin County. The prosecutors presented testimony about this war of rivalry in the hearing before Judge Wickersham, as well as the materials purchased from the four bookstores in Dauphin County; and with that testimony and those materials before him, Judge Wickersham issued the injunction.

In light of these facts, it is clear that if we were to grant the equitable relief requested in this case, we would be interfering with the Commonwealth of Pennsylvania's justifiable and pressing interest in the uninterrupted enforcement of its laws. Moreover, we would be impeding, at least indirectly, the Commonwealth's interest in the enforcement of its criminal laws.[15] According-

---

14. See also Mitchum v. Foster, 407 U.S. 225, 244, 92 S.Ct. 2151, 2163, 32 L.Ed.2d 705 (1972) (concurring opinion of Chief Justice Burger, where the identical question was left open on facts similar to those presented here) :

"We have not yet reached or decided exactly how great a restraint is imposed by these principles on a federal court asked to enjoin state *civil* proceedings. Therefore, on remand in this case, it seems to me the District Court, before reaching a decision on the merits of appellant's claim, should properly consider whether general notions of equity or principles of federalism, similar to those invoked in Younger,

prevent the issuance of an injunction against the state 'nuisance abatement' proceedings in the circumstances of this case."

15. The Fifth Circuit, on facts similar to those presented here, has held that an action instituted by the Solicitor General of the Criminal Court of Fulton County, Georgia, to have two films declared obscene and subject to seizure, pursuant to Georgia Code § 26–2101, was a civil technique for enforcing Georgia's criminal laws on obscenity and was therefore subject to the *Younger* doctrine. Palaio v. McAuliffe, 466 F.2d 1230 (5th Cir. 1972). While we would agree with the

ly, we conclude that, regardless what nomenclature may be used to describe the state injunctive procedure employed in this case, this is the kind of case in which we are constrained by the principles of comity and federalism to observe a hands-off policy.[16] Thus, in the absence of a showing of the kind of "bad faith, harassment, or other unusual circumstances that would call for equitable relief [,]" Younger v. Harris, 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669 (1970), plaintiff's suit must be dismissed.

## IV.

Plaintiff contends that this case indeed does present unusual circumstances which call for equitable relief. Specifically, plaintiff argues that two of Judge Wickersham's actions in this case constitute sufficient "bad faith" to warrant the granting of equitable relief by a federal court: (1) his decision to proceed with the hearing on the continuance of the preliminary injunction on April 29, 1974, even though he knew that the case had been effectively removed under 28 U.S.C.A. Section 1446(e) and he had been informed that the same federal statute directs a state court to proceed no further once a case has been removed

unless and until the case is remanded; and (2) his indefinite continuance of the preliminary injunction on May 29, 1974.

■ Upon careful consideration of both of Judge Wickersham's actions in the context of the other circumstances of the case, we conclude that those actions do not constitute the bad faith or harassment that would warrant a federal court's abandoning the normal policy of noninterference with a pending state proceeding. The kind of showing that must be made to justify such a departure is either "proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction [.]" Perez v. Ledesma, 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1970). The facts of this case do not amount to such a showing. Judge Wickersham's decision to proceed with the case in the face of an effective removal was at worst a procedural irregularity prompted by his reluctance to allow the *ex parte* preliminary injunction to expire automatically, which it would have done had he not proceeded with the hearing on April 29, 1974 (see Rule 1531(d), Pa.R.Civ.Proc.); and it may have merely been caused by a misreading of the removal statute. In neither event was there the kind of

Fifth Circuit's conclusion that a state statute such as the one at issue here is a technique for enforcing the state's criminal obscenity laws, we do not ground our decision on that rationale alone. We also base our decision on the fact that the proceeding we are asked to enjoin, whatever label may be ascribed to it, involves a state law, the enforcement of which must be prompt and unencumbered.

16. This conclusion applies equally to plaintiff's claims for injunctive as well as declaratory relief. While we recognize that the recent opinion in Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) held that different considerations are involved when declaratory and not injunctive relief is at issue, we also note that *Steffel* did not involve an ongoing state proceeding, and that the Court, after concluding that "[w]hen no state proceeding is pending . . . considerations of equity, comity,

and federalism have little vitality," Id., at 462, 94 S.Ct., at 1217, rendered its decision about the propriety of declaratory relief in that case without considering any countervailing principles of federalism. This case, by contrast, involves an ongoing state proceeding the nature of which compels us, under principles of federalism, to refrain from granting injunctive relief. We therefore conclude that plaintiff's request for declaratory relief should also be dismissed, in light of the holding of Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971) that "in cases where the state criminal prosecution was begun prior to the federal suit, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment, and that where an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well." Id., at 73, 91 S.Ct., at 768.

bad faith or harassment that calls for federal court intervention in a case such as this. Cf. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) and Shaw v. Garrison, 328 F. Supp. 390 (E.D.La.1971), aff'd, 467 F.2d 113 (5th Cir.), cert. denied, 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972). Furthermore, no bad faith emerges from Judge Wickersham's indefinite continuance of the preliminary injunction on May 31. Such an action seems warranted by the absence of two of the four principal parties in the case, and, in any event, Classic never requested a final hearing pursuant to Rule 1531(f), Pa.R.Civ.P. In short, there is nothing in the facts of this case to dissuade us from concluding that there was no threat of injury to plaintiff's federally protected rights, including its rights under the First and Fourteenth Amendments which it seeks to have us vindicate, that could not have been relieved by its defense in the single proceeding before the state court. See Younger v. Harris, 401 U.S. 37, 46, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970).

## V.

To summarize, plaintiff's claim for damages must be dismissed because of the doctrines of judicial and prosecutorial immunity. And, since the state action with which we are asked to interfere by way of injunctive or declaratory relief is a proceeding in which the Commonwealth of Pennsylvania's interest in the prompt and unencumbered enforcement of its laws is paramount, we must decline to grant such relief, as there has been no showing of unusual circumstances which would warrant our departure from the normal federal policy of nonintervention in such a case. Therefore, the defendants' motion to dismiss must be granted.[17]

---

17. Inasmuch as we have granted the defendants' motion to dismiss on the basis of their first two grounds for that motion, there is no need to consider defendants' contention that this court should abstain from this case because the applicable statute has not been authoritatively construed by the Pennsylvania courts.